# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

(To be supplied by the court)

TEDDY T. PITTMAN

_____, Plaintiff

v.

TIM KING
_____,

GRETA SALAZAR
_____,

SCOTT BAKER
_____,

CITY OF AURORA
_____,

LIEUTENANT BELL
_____,

MATTHEW PEREZ
_____,

PATRICE NIXON
_____,

G. MAHR JR.
_____,

CITY & COUNTY OF DENVER
_____,

JOHN AND JANE DOE'S
_____,

Defendant(s).

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

NOV 12 2020

JEFFREY P. COLWELL
CLERK

---

## COMPLAINT

---

## NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.**

## A.    PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

Teddy T. Pittman     4676 Walden Ct. Denver, CO 80249
_____
(Name and complete mailing address)

ttpittman1979@yahoo.com_____

(Telephone number and e-mail address)

## B.    DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1:    TIM KING 15151 E. Alameda Ave. Aurora, CO 80012_____
                        (Name and complete mailing address)

                        _____
                        (Telephone number and e-mail address if known)

Defendant 2:    GRETA SALAZAR  15151 E. Alameda Ave. Aurora, CO 80012_____
                        (Name and complete mailing address)

                        _____
                        (Telephone number and e-mail address if known)

2

Defendant 3:    SCOTT BAKER.   15151 E. Alameda Ave. Aurora, CO 80012

(Name and complete mailing address)

(Telephone number and e-mail address if known)

Defendant 4:    CITY OF AURORA.    15151 E. Alameda Ave. Aurora, CO 80012
(Name and complete mailing address)

(Telephone number and e-mail address if known)

Defendant 5:    LIEUTENANT BELL  1331 Cherokee St. Denver, CO 80204
(Name and complete mailing address)

(Telephone number and e-mail address if known)

Defendant 6:    MATTHEW PEREZ.    1331 Cherokee St, Denver, CO 80204
(Name and complete mailing address)

(Telephone number and e-mail address if known)

Defendant 7:    PATRICE NIXON   1331 Cherokee St, Denver, CO 80204
(Name and complete mailing address)

(Telephone number and e-mail address if known)

Defendant 8:    G. MAHR JR.    1331 Cherokee St, Denver, CO 80204
(Name and complete mailing address)

(Telephone number and e-mail address if known)

3

Defendant 9:      CITY & COUNTY OF DENVER.  1331 Cherokee St, Denver, CO 80204
                        (Name and complete mailing address)


                        (Telephone number and e-mail address if known)

Defendant 10:    JOHN DOE & JANE DOE      T.B.D.
                        (Name and complete mailing address)


                        (Telephone number and e-mail address if known)



**C.          JURISDICTION**
*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

 X    Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution,
        laws, or treaties of the United States)

        List the specific federal statute, treaty, and/or provision(s) of the United States
        Constitution that are at issue in this case.
        42 U.S.C. § 1983 Fourth amendment and Fourteenth amendment.

_____   _____


_____
\_\_\_\_   Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or
        corporate citizens of different states and the amount in controversy exceeds $75,000)

        Plaintiff is a citizen of the State of _____COLORADO_____.


        If Defendant 1 is an individual, Defendant 1 is a citizen of \_\_COLORADO_____
        .


        If Defendant 1 is a corporation,

        Defendant 1 is incorporated under the laws of _____ (name of state
        or foreign nation).

4

Defendant 1 has its principal place of business in _____ (name of state or foreign nation).

(*If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.*)

## D.    STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

**CLAIM ONE:**   42 U.S.C. § 1983-Fourth Amendment-Unlawful Search of Person; _____

Supporting facts:

1. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.

2. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

3. This claim one is being leveled against Defendants Tim King, Greta Salazar, Scott Baker, City of Aurora, Lt. Bell, Matthew Perez, Patrice Nixon, G. Mahr Jr., City & County of Denver, and John and Jane Doe Police Officers (to be determined), in their individual and official capacities, as employees of the City of Aurora and City and County of Denver.

## l. INTRODUCTION

4. This civil action, filed by Teddy T. Pittman, herein the Plaintiff, encompasses the unlawful search and seizure of the Plaintiff, by Defendants, during a "Terry" stop, where none of the Defendants, at any time, had probable cause, reasonable suspicion, or any other legal basis to believe that Plaintiff had committed or were committing any crimes prior to the unlawful search and seizure and continued restraint of his person, effectively violating Plaintiff's Fourth Amendment rights to the United States Constitution.

5. In effectuating the unlawfulness of the searches and seizure of Plaintiff's person and vehicle, the named Defendants violated Plaintiff's due process rights under the Fourteenth Amendment of the United States Constitution, where they conducted the investigative stop, without articulable probable cause, reasonable suspicion, or any other legal basis to believe that Plaintiff had committed or we're committing crimes and instituted the stop by use of force.

6. This practice is not only expressly prohibited by clearly established United States Supreme Court and Tenth Circuit case law, but has been roundly condemned by the City Attorney's Office, criticized in dozens of citizen complaints filed with the City's Internal Affairs Bureau, and highlighted in several federal lawsuits against the City of Aurora. It has nevertheless continued unabated without any of the officers involved being punished, re-trained, or even subjected to additional supervision, and with Deputy Chief of the Aurora Police Department even condoning such practices under oath in a deposition.

7. Plaintiff seeks to discover the names and identities of the John and Jane Doe Defendants, the extent of this blatantly unconstitutional custom & training to seek declaratory and compensatory relief, and to impose punitive damages to deter this type of misconduct in the future.

## II. FACTUAL ALLEGATIONS

**A. The April 24, 2020 Unlawful Search and Seizure of Mr. Pittman**

8. On 04/24/2020, at 4:30pm, Plaintiff was leaving a friend's home near E. Colfax Ave. and N. Beeler St., located in Aurora, Colorado and began driving home.

9. As Plaintiff proceeded to drive home, he became afraid for his life, when he noticed multiple unmarked police vehicles following him.

10. Upon information and belief, Plaintiff was being followed by members of the FBI Rocky Mountain Safe Streets Task Force (herein "Task Force").

11. The Task Force, is comprised of members from the Federal Bureau of Investigations (herein "FBI"), United States Marshal Service (herein "Marshal"), Aurora Police Department (herein "APD"), Denver Police Department (herein "DPD"), Colorado Department of Corrections (herein "CDOC").

12. The Task Force's primary focus is to apprehend violent fugitives, with warrants for crimes involving violent crimes, and to conduct narcotics investigations.

13. Plaintiff believed the Task Force followed him, to physically harm him, because he hadn't committed any crimes, nor had outstanding warrants.

14. Plaintiff had reason to be afraid, due to past victimization by APD. See Pittman v. Palacio, et al., and Pittman v. City of Aurora, et al.

15. Upon information and belief, the Task Force followed Plaintiff to harass him, due to his pending litigation against the City of Aurora and APD officers.

16. The Task Force followed Plaintiff for approximately 10 miles, throughout the City of Aurora, from E. Colfax Ave. and N. Beeler St., to N. Peoria St. and S. Parker Rd., to harass him.

17. During the 10 miles, none of the Task Force Defendants turned on their emergency lights to stop Plaintiff.

18. As a matter of fact, Defendant King contacted Defendant Baker electronically and ordered him to conduct a "routine" traffic stop on Plaintiff's vehicle.

19. Defendant Baker radioed Defendant Salazar with instructions to make the "routine" traffic stop.

20. Defendant King immediately contacted Defendant Baker changing the order from a "routine" traffic stop to a "felony" traffic stop.

21. Defendant Baker radioed for Defendant Salazar with instructions to make a "felony" traffic stop.

22. When Plaintiff got to N. Peoria St. and S. Parker Rd., Defendant Salazar got behind his vehicle and activated her emergency lights.

23. Plaintiff immediately pulled to the side of the road and turned off his vehicle.

24. The Task Force Defendants converged on Plaintiff's vehicle, in strategic positions, with their weapons drawn and pointed directly at Plaintiff.

25. When Defendants were positioned, Defendant Salazar ordered Plaintiff to step out of the vehicle with his hands where she could see them.

26. After Plaintiff got out of the vehicle, Defendant Salazar ordered him to step toward the back of the vehicle, lay flat on the ground, and to crawl towards her.

27. Plaintiff complied with Defendant Salazar's orders frightened by at least 10 firearms pointed at him.

28. When Plaintiff got to the spot where Defendant Salazar wanted him, she ordered him to stop and lay back down.

29. Defendant Salazar asked Plaintiff if there was anyone else in the vehicle and Plaintiff confirmed that no one else was in the vehicle.

30. Defendants Baker and Perez approached the vehicle with their weapons on the vehicle and found no passengers, weapons, or evidence of any criminal activity.

31. The vehicle Plaintiff was driving had no tint on the front driver and passenger windows and very light tint on the rest of the windows.

32. After clearing the vehicle, Defendants Salazar and Baker approached Plaintiff with their weapons pointed at his person.

33. Defendant Salazar began pat searching Plaintiff's person while Defendant Baker pointed his gun at Plaintiff.

34. During the pat search, Defendant Salazar put Plaintiff in handcuffs behind his back, and continued pat searching him.

35. The pat search was done without Plaintiff's consent, reasonable suspicion, probable cause, or any other legal basis.

36. While Defendant Salazar pat searched Plaintiff, Defendant Perez began asking Plaintiff if there was a gun in the vehicle, which Plaintiff denied.

37. Defendant Baker went to the driver side of the vehicle to visually inspect the interior.

38. This was the second time Defendant Baker inspected the vehicle.

39. Defendant Baker exclaimed that a gun was in the vehicle, inside a Crown Royal bag, on the driver side floor.

40. Plaintiff knew the accusation was false, because only change was in the Crown Royal bag.

41. Plaintiff used the Crown Royal bag as a piggy bank to save his change.

42. This conduct confirmed Plaintiff's belief that the Defendants were up to no good.

43. Upon information and belief, Defendants Baker and Salazar's body camera footage, clearly show that a gun wasn't in the Crown Royal bag.

44. The bag was open with a piece of paper sticking out of it, with no sign of a gun, i.e., a gun sticking out the bag or the bag having an impression of a gun.

45. As a matter of fact, all the Defendants walked over to look at the Crown Royal bag and/or touched it, and knew there wasn't a gun in the bag.

46. Defendant Baker's gun claim was a hoax, for the purpose of extending the detainment and fabricating probable cause to search the vehicle.

47. After pat searching Plaintiff, Defendant Salazar made him sit on the ground, with his hands cuffed behind his back.

48. No drugs or evidence of a crime were found on Plaintiff's person.

49. Defendant Bell began asking Plaintiff for his name and date of birth. Plaintiff told him that his identification (I.D.) was in his pocket.

50. Approximately 10min into the stop, Defendant Bell took Plaintiff's wallet off his person.

51. Plaintiff's wallet produced a Colorado driver's license and passport as proof of his identity.

52. Several Defendants reviewed Plaintiff's driver's license and passport to confirm his identity.

53. Defendant Bell gave Defendant Salazar Plaintiff's driver's license presumably to check if he had warrants.

54. Plaintiff's warrant check came back back clear and he didn't have any warrants.

55. Defendant Perez confirmed to Defendant Baker that Plaintiff had good I.D., and that he wasn't their target.

56. Instead of instructing Defendant Baker to release Plaintiff, Defendants Perez and Baker conspired to extend Plaintiff's detainment, to search his vehicle for guns and drugs, based entirely on his criminal history and race, and discussed Possession Of a Weapon by a Previous Offender ("POWPO") multiple times, before the illegal searches ever took place, indicating Plaintiff's criminal history was the basis of the unlawful searches.

57. Upon information and belief, Defendants King and Baker, went to Plaintiff's vehicle, to determine if a gun was in the Crown Royal bag.

58. Defendant King leaned over into the truck and moved the Crown Royal bag, confirming a gun wasn't there.

59. Defendants King and Baker's search of the Crown Royal bag was conducted without Plaintiff's consent, reasonable suspicion, probable cause, or any other legal basis.

60. Even after searching the Crown Royal bag, Defendants King and Baker conspired to extend Plaintiff's detainment, to search his vehicle for guns and drugs.

61. Defendants had determined Plaintiff didn't have warrants, that he wasn't their target, and that a gun wasn't in the Crown Royal bag, but continued to detain him based on his criminal history and race, using identification as a ploy to justify the continued detainment.

62. The identification ploy was a ruse to cover up Defendants plan to illegally search Plaintiff's vehicle.

63. Defendants had two forms of identification documents, as verification of Plaintiff's identity, which they were comfortable with, but were conspiring to arrest him on a manufactured traffic offense and fingerprint him at the jail to learn his identity.

64. Defendants planned to manipulate the warrant requirement, by having the vehicle towed, whereas they could search the vehicle under the guise of an inventory search.

65. Defendant Baker asked Plaintiff if they had his permission to search the vehicle, which Plaintiff declined, informing Defendants, that he was giving them permission to release the vehicle to his girlfriend, who was at the scene of the traffic stop the entire time.

66. When Plaintiff refused to give him consent to search the vehicle, requesting that the vehicle be released to his girlfriend, Defendant Baker told Plaintiff that they'll just tow it and hold it. In other words, "we'll search the vehicle anyway."

67. APD has a history of refusing to release vehicles of arrestees to passengers or people at the scene, in accordance with their own policies, whereas they can tow and search the vehicles, under the guise of an inventory search.

68. Defendants Bell and Baker, immediately went to the driver's side of the vehicle and began searching it.

69. After Defendant Bell searched the Crown Royal bag and side door compartment, confirming there wasn't a gun in the bag, Defendants Bell, Baker and King conspired to search the entire vehicle.

70. Defendant Bell asked if they were towing the vehicle and Defendant King responded affirmatively.

71. Immediately, Defendants King, Bell, Baker, Perez, and the John and Jane Doe Defendants began searching the vehicle.

72. Upon information and belief, the search of Plaintiff's vehicle clearly wasn't an inventory search, but rather an investigative search.

73. Defendants weren't taking inventory of the contents of the vehicle, although there was a lot of valuable property in the vehicle, including money, because their only concern was to search the vehicle for drugs and guns.

12

74. No drugs, guns or evidence of a crime were found in Plaintiff's vehicle.

75. Defendants search of Plaintiff's vehicle, was conducted without his consent, reasonable suspicion, probable cause, or any other legal basis.

76. Defendants King and Bell went back to the Plaintiff and began searching his person again, for the third time, without his consent, reasonable suspicion, probable cause, or any other legal basis.

77. No drugs, guns or evidence of a crime were found on Plaintiff's person.

78. After the unlawful vehicle search was finished, Plaintiff was forced to sit on the curb for nearly an additional twenty minutes.

79. Defendants body cameras clearly show that Plaintiff felt threatened, was exhausted, scared, and humiliated throughout the process of the unlawful search, misconduct, and unreasonable detention that was forced upon him by the Task Force Defendants.

80. The unlawful search and unreasonable detention of Plaintiff lasted nearly 1 hour before Plaintiff was finally allowed to leave and his vehicle released to his girlfriend.

81. Prior to leaving, Plaintiff demanded an explanation, as to why the Task Force Defendants followed, stopped, and detained him, and was told that they believed a fugitive wanted for robbery was in his vehicle, because the fugitive's cell phone was ringing in Plaintiff's vehicle.

82. This claim was incredible, and a ruse to cover up their intentions to harass Plaintiff and to illegally search his vehicle.

83. Defendant King and Plaintiff, were very familiar with one another from previous police encounters.

84. If the Task Force Defendants proposition were true, immediately upon determining Plaintiff was the only person in the vehicle, wasn't their target, and didn't have any outstanding warrants,

the purpose of the traffic stop was complete, and they should have immediately returned his identification documents and allowed him to leave.

85. Instead of returning his documents, however, Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Defendants impermissibly continued to detain Plaintiff, unlawfully extended the scope and duration of the stop, and transformed the stop into a criminal investigation and subsequent arrest.

86. Even though the purpose of the traffic stop was complete, Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Defendants conspired to arrest Plaintiff, so that they could search his person and vehicle for drugs and guns.

87. Upon information and belief, the Task Force Defendants had Plaintiff under surveillance and were following him for hours leading up to the unlawful detainment and illegal searches.

88. Plaintiff first crossed paths with the Task Force Defendants in Denver, at E. Colfax Ave. and N. Uinta St.

89. When Plaintiff stopped on E. Colfax Ave. and N. Uinta St., to visit a friend, Defendants King and Mahr observed Plaintiff, so they saw Plaintiff's race and were aware that he is African American.

90. Plaintiff immediately recognized Defendant King, and Defendant King recognized Plaintiff.

91. Unbeknownst to Plaintiff, the Task Force Defendants aborted their assignment, to follow and harass him.

92. The Task Force Defendants followed  Plaintiff from E. Colfax Ave. and N. Uinta St. (Denver), to E. 17th and N. Boston St. (Aurora).

93. Then they followed him from E. 17th and N. Boston St. (Aurora), to the Carriage Motel, located at 9201 E. Colfax Ave, Aurora, CO. 80010.

14

94. During the surveillance, the Task Force Defendants didn't see anyone in the vehicle with Plaintiff.

95. The Task Force Defendants didn't see anyone get in or out of Plaintiff's vehicle At no time during the surveillance, and knew no else was in the vehicle.

96. Upon information and belief, Plaintiff wasn't the Task Force Defendants assignment on the day of the unlawful detainment and illegal search.

97. The Task Force Defendants stopped Plaintiff to conduct a criminal investigation, without reasonable suspicion, probable cause, or any legal basis, that he had committed or was committing crimes, or that Plaintiff was armed and dangerous, but solely based on his race and criminal history.

98. In an attempt to cover up the misconduct, Defendant King told Defendant Salazar to give Plaintiff false charges for making an illegal turn and driving under suspension.

99. The Arapahoe County District Attorney's Office reviewed the traffic charges that stemmed from the April 24, 2020 traffic stop, and on August 20, 2020 District Attorney George Brauchler and his Deputy District Attorney dismissed the charges "in the best interest of judgment," after determining the Task Force Defendants lacked any legal basis to stop Plaintiff.

100. Plaintiff filed administrative complaints with the APD and DPD Internal Affairs Bureaus regarding the April 24, 2020 traffic stop.

101. The complaint and body camera footage from the April 24, 2020 incident was reviewed by the APD Internal Affairs Bureau clearly shows that the Task Force Defendants conspired to stop, search, and detain Plaintiff with no legal basis.

102. The APD and DPD nevertheless determined that the actions of the Defendant Officers involving Plaintiff on April 24, 2020 were lawful and that no disciplinary action, training, or

additional supervision was necessary.

103. Upon information and belief, no officer has been disciplined, reprimanded, or received additional training as a result of the April 24, 2020 incident with Plaintiff.

104. The Fourth Amendment to the United States Constitution provides individuals with the right to be free from unreasonable searches of their person.

105. The right not to be subjected to a pat-down search of the body without sufficient evidence to establish reasonable suspicion of being armed and dangerous is clearly established. See Terry v. Ohio, 391 U.S. 1 (1968).

106. Any reasonable person in the position of Defendants King, Salazar, Baker, Bell, Perez, Nixon, Mahr, and the John and Jane Doe Police Officers, knew or should have known of this clearly established right.

107. Defendants King, Salazar, Baker, Bell, Perez, Nixon, Mahr, and the John and Jane Doe Police Officers, violated Plaintiff's Fourth Amendment rights by removing him from his vehicle to search his person without reasonable suspicion to believe he was armed or dangerous.

108. Defendants Salazar, Baker, King, and Bell violated Plaintiff's Fourth Amendment rights by searching his person for several minutes without consent, reasonable suspicion, probable cause, or any other lawful basis.

109. Defendants Perez, Nixon, Mahr, and the John and Jane Doe Police Officers actively participated in the unlawful search by drawing their weapons and helping Defendants Salazar, Baker, King, and Bell remove Plaintiff from the vehicle to search his person.

110. The decision by Defendants Salazar, Baker, King, and Bell to search Plaintiff was not objectively reasonable in light of the circumstances confronting them.

111. Additionally, Defendants Perez, Nixon, Mahr, and the John and Jane Doe Police Officers

16

failed to intervene in Defendants Salazar, Baker, King, and Bell's unlawful search of Plaintiff's person, despite knowing that Defendants Salazar, Baker, King, and Bell was conducting the search without consent, reasonable suspicion, probable cause, or any other lawful basis.

112. The actions of Defendants King, Salazar, Baker, Bell, Perez, Nixon, Mahr, and the John and Jane Doe Police Officers were made in intentional, malicious, willful, and/or reckless disregard of Plaintiff's constitutional rights.

113. As a direct and proximate result of the actions of Defendants Salazar, Baker, King, and Bell in conducting the unlawful search of Plaintiff's body, and in Defendants Perez, Nixon, Mahr, and the John and Jane Doe Police Officers failing to intervene in the unlawful search, Plaintiff suffered emotional distress, humiliation, and dignitary injuries.

**B. The City of Aurora Has a Continuing, Persistent, and Widespread Informal Custom of Unlawfully Seizing and Searching African Americans Based on their Race and Criminal History**

114. City of Aurora police officers have engaged in a pervasive pattern and practice of unlawfully extending traffic stops beyond their permissible scope and duration to conduct unlawful and invasive searches of the bodies and vehicles of African Americans based solely on their race and criminal history, and not on consent, reasonable suspicion, probable cause, or any other lawful basis.

115. The City of Aurora has a lengthy and well-documented history of misconduct similar to what occurred with Plaintiff on April 24, 2020.

116. These incidents, in combination with the data and records of traffic stops in the City of

17

Aurora, establish a widespread custom or practice among Aurora police officers to unlawfully seize and search African Americans based on their race and criminal history.

117. The established and widespread custom or practice among Aurora police officers to unlawfully seize and search based on race and criminal history are evidenced by the following examples involving Mr. Pittman, Nakiko Diallo, Angela Brown, Keith Penny, James Lawrence, and Jehrone Falls.

*1. Nakiko Diallo – November 9, 2016 Unlawful Search and Seizure*

118. Nakiko Diallo, an African American man, was pulled over by City of Aurora police officers in a traffic stop, allegedly for driving above the speed limit and having non-functioning tail lights.

119. Because Officer Matthew Milligan obtained Mr. Diallo's license, registration, and other documents from him, he knew that Mr. Diallo was African American.

120. Officer Milligan returned to his patrol car, learned of Mr. Diallo's criminal history and told another officer: "We need to search this vehicle essentially."

121. Officer Milligan sought Mr. Diallo's consent to conduct a search of his vehicle, but Mr. Diallo refused. Officer Milligan proceeded with the search anyway.

122. The decision to search Mr. Diallo's vehicle was without reasonable suspicion, probable cause, or any other lawful basis.

123. In a subsequent inventory search of Mr. Diallo's vehicle recorded by Officer Milligan's body camera, Officer Milligan can be seen searching a lunch box and finding no drugs or other contraband, then turning off his camera.

124. When Officer Milligan instructed another officer to search the same lunch box again several minutes later, drugs and other contraband were suddenly easily visible.

125. This unlawful search and seizure led to a §1983 suit in this District, case number 18-cv-02898.

126. Upon information and belief, no officer has been disciplined, reprimanded, or received additional training as a result of the November 9, 2016 incident with Mr. Diallo.

*2. Angela Brown & Keith Penny – April 15, 2017 Unlawful Search and Seizure*

127. On April 15, 2017, Aurora police officer Andrew McDermott effectuated a traffic stop on a young African American couple—Angela Brown and Keith Penny—and subjected them to invasive searches of their bodies and vehicle based solely on their race and Mr. Penny's criminal history, and without probable cause, reasonable suspicion, or any other lawful basis.

128. That day, Ms. Brown was driving down East Colfax Avenue with her husband in the passenger seat when Officer McDermott and his partner (a police officer trainee, Officer Bess) pulled them over.

129. As officers had done with Mr. Pittman in January 2019, Officer McDermott explained that he had pulled Ms. Brown over because of a defective tail light, and requested she produce her driver's license, registration, and insurance.

130. Officer McDermott then returned to his patrol car and ran background checks on Ms. Brown and Mr. Penny.

131. Shortly thereafter, Officer McDermott exited his patrol vehicle and told his trainee that "[Mr. Penny's] got priors for coke, drug abuser, and gang stuff. . . . So let's pull em' out [of the

19

car], we'll pat' em down, [and] just sit 'em [on the curb]. I'll ask her for consent, if she denies it either way we'll protectively sweep the car, make sure there's no weapons in there and then I'll finish the summons."

132. Officer McDermott was aware that both Ms. Brown and Mr. Penny are African American.

133. Without consent or any other lawful basis, Officer McDermott ordered Mr. Penny to exit the vehicle and informed him that he was going to pat him down.

134. Officer McDermott searched Mr. Penny's body, including an in-depth examination of his arms, legs, and waistband, and Mr. Penny was ordered to sit on the curb.

135. Officer McDermott then instructed Ms. Brown to exit the vehicle so he could conduct a search of her person, walked her to the back of her vehicle, and performed a pat-down of her body.

136. Officer McDermott then instructed Ms. Brown to sit on the curb next to her husband.

137. Officer McDermott then searched Ms. Brown's vehicle, including the side doors, seats, and middle console.

138. While searching the back of Ms. Brown's vehicle, Officer McDermott can be heard saying: "There's dope in here somewhere."

139. Officer McDermott explained to Mr. Penny and Ms. Brown that he decided to searched the vehicle because of Mr. Penny's "prior arrests for drug distribution," and later said that "in years of doing this job, I have found that typically speaking, people who have a past that's similar to yours tend to reoffend more often than not."

140. Officer McDermott searched Ms. Brown's and Mr. Penny's bodies solely because of their race and Mr. Penny's criminal history, and without any lawful basis to do so.

141. This was not the first time, however, that Mr. Penny was unlawfully searched by Aurora

officers.

142. Upon information and belief, Mr. Penny had been stopped by Aurora officers on at least four or five occasions before April 15, 2017 and was pulled out of the vehicle and subjected to pat-down searches on most of those occasions.

143. A complaint was filed with the Aurora Police Department's Internal Affairs Bureau regarding the April 15, 2017 incident.

144. During the Internal Affairs investigation, Officer Hess stated that, "[i]f we're going to pull somebody out of a car during the course of a traffic stop, it's kind of standard that we do a quick pat-down [search]"—apparently without needing to establish reasonable suspicion, probable cause, or any other legal standard for such a search.

145. The Internal Affairs Bureau ultimately determined that the officers' conduct during the April 15, 2017 search was lawful, and that no discipline, training, or additional supervision was necessary.

146. Mr. Penny and Ms. Brown filed a lawsuit against Officer McDermott and the City of Aurora in April 2019 alleging they were unlawfully searched and seized by Officer McDermott, case number 19-cv-01108.

147. In that lawsuit, Mr. Penny and Ms. Brown also disclosed an expert witness in police procedure, Dan Montgomery, who determined that Officer McDermott's actions on April 15, 2017 "were clearly inappropriate and not based on any reasonable suspicion."

148. Mr. Montgomery also reviewed fourteen separate police reports regarding searches conducted by Officer McDermott in 2016 and 2017.

149. Mr. Montgomery determined that Officer McDermott "did not collect objective, articulable facts necessary for, and did not have sufficient reasonable suspicion to conduct body pat down

searches for weapons" in ten of the fourteen cases he reviewed.

150. Mr. Montgomery also noted that "[e]ach of these police reports had to be reviewed by a supervisor and based on what I have reviewed, they were all approved, thus condoning Officer McDermott's actions and enabling him to continue his performance improprieties."

151. Upon information and belief, a disproportionate number of the individuals in the ten unlawful pat-down searches identified by Mr. Montgomery were people of color.

152. Upon information and belief, no officer has been disciplined, reprimanded, or received additional training as a result of the April 15, 2017 incident with Ms. Brown and Mr. Penny.

*3. James Lawrence – January 31, 2018 Unlawful Search and Seizure*

153. On January 31, 2018, James Lawrence was subjected to an unlawful search and seizure by City of Aurora officers based on his race and criminal history, and without probable cause, reasonable suspicion, or any other lawful basis.

154. Like Mr. Penny, Mr. Diallo, Mr. Falls, and Mr. Pittman, Mr. Lawrence is an African American male.

155. After Officer Grant Peet pulled Mr. Lawrence over for purported traffic infractions, he requested Mr. Lawrence's license, registration, and insurance.

156. Officer Grant then returned to his patrol car to run a background check on Mr. Lawrence.

157. Having received the results of Mr. Lawrence's background check, Officer Grant approached Mr. Lawrence's vehicle and stated to his partner that he was "gonna pull him out [of his vehicle]."

158. Without explanation, Officer Grant then grabbed Mr. Lawrence's left arm and wrist and

22

twisted it into a wrist lock, ordered him to put his right hand on his head, and opened his car door.

159. While keeping Mr. Lawrence's arm in a twist-lock, Officer Grant forced Mr. Lawrence to his feet and subjects him to a pat-down search without consent, reasonable suspicion, probable cause, or any other lawful basis.

160. Officer Grant then told Mr. Lawrence that "[t]he reason we're doing that is because of your history—you got weapons charges, things like that in the past."

161. Officer Grant asked for consent to search Mr. Lawrence's vehicle, and he refused.

162. Officer Grant then proceeded to perform a search of Mr. Lawrence's vehicle without consent, reasonable suspicion, probable cause, or any other lawful basis.

*4. Teddy Pittman - January 19, 2019, Unlawful Search and Seizure*

163. On January 19, 2019, after leaving the Kings Motor Inn, located at 11800 E. Colfax Ave., while traveling westbound on Colfax Ave., Teddy T. Pittman noticed he was being followed by an Aurora Police Officer, later determined to be Officer Darian Dasko.

164. Officer Dasko followed Mr. Pittman for approximately 3 miles through the City of Aurora, then activated his emergency lights just as Mr. Pittman was crossing into Denver from Aurora.

165. Mr. Pittman immediately stopped his vehicle at E. Colfax Ave. and N. Xanthia St. in Denver. Mr. Pittman was scared, because he had done nothing wrong, and didn't know why he was being stopped.

166. Officer Dasko approached the driver side of the vehicle and contacted Mr. Pittman, and told Mr. Pittman that he was being stopped for a defective driver side headlamp and requested his

identification documents.

167. Mr. Pittman knew that the reason for the stop wasn't right, because there wasn't anything wrong with the headlamps on his vehicle.

168. While sitting there waiting for Officer Dasko to return his identification documents, 8-10 police officers arrive on scene as backup, including Officers Palacio and Veith.

169. Officer Dasko returned to Mr. Pittman's vehicle and demanded him to step out of the vehicle, so he could search Mr. Pittman's person and vehicle for weapons and drugs. Officer Dasko did not have reasonable suspicion to believe that Mr. Pittman had committed any crimes.

170. When Mr. Pittman protested, Officers Dasko and Veith, put Mr. Pittman in a twist lock, pulled him out of his vehicle, and searched Mr. Pittman's person and vehicle by force, without his consent, reasonable suspicion, probable cause, or any other legal basis. See *Pittman v. Palacio, #2019-cv-01947.*

171. A complaint was filed with the Aurora Police Department's Internal Affairs Bureau regarding the January 19, 2019, incident.

172. The complaint and body camera footage from the January 19, 2019 incident was reviewed by Lieutenant Chad Cerinich in the Bureau of Internal Affairs for the Aurora Police Department.

173. Although Lieutenant Cerinich could clearly hear Officer Dasko say twice on his body camera that he was searching Mr. Pittman based on his criminal history and gang affiliation, Lieutenant Cerinich nevertheless determined that the actions of Officers Dasko, Burke, Veith, and Palacio involving Mr. Pittman on January 19, 2019 were lawful and that no disciplinary action, training, or additional supervision was necessary.

174. Lieutenant Cerinich not only disagreed with the conclusion reached by Assistant City Attorneys Wood and Koumantakis, but even wrote an email to Deputy City Attorney Julie

24

Heckman (head of the Criminal Division of the City Attorney's Office), advising her of "[his] disagreement with the decision of her office to dismiss the charges against [Mr.] Pittman."

175. Upon information and belief, no officer has been disciplined, reprimanded, or received additional training as a result of the January 19, 2019, incident.

*5. Teddy Pittman - April 3, 2019 Unlawful Search and Seizure*

176. Less than three months after the January 19, 2019 unlawful search and seizure, Mr. Pittman was again unlawfully searched and seized by Aurora police officers under nearly identical circumstances.

177. Mr. Pittman was driving his vehicle from a 7-11 convenience store to the King's Motor Inn when he noticed he was being followed by an Aurora Police Department patrol car.

178. Officer Delbert Tisdale was driving the patrol car, with Officer David Zimmerman as his passenger.

179. Approximately four minutes before effectuating the traffic stop, Officers Tisdale and Zimmerman ran a background check on Mr. Pittman and confirmed he had no outstanding warrants and that his car registration was valid.

180. As Mr. Pittman pulled into the parking lot of the King's Motor Inn, Officers Tisdale and Zimmerman activated their emergency lights to effectuate a traffic stop, and Mr. Pittman immediately stopped his vehicle.

181. Mr. Pittman was very scared, because he had done nothing wrong and did not know why he was being stopped.

182. Officer Tisdale approached the driver's side of Mr. Pittman's vehicle and ordered him to

25

roll down all of his windows.

183. Officer Tisdale claimed he stopped Mr. Pittman because he purportedly failed to use his turn signal.

184. Within seconds, Officers Jeremy McElroy and Anthony Spano arrived on the scene in their patrol car.

185. While Officer Tisdale was standing at the driver's side of Mr. Pittman's vehicle, Officer Zimmerman approached the passenger side, and Officers Spano and McElroy approached the rear of Mr. Pittman's vehicle, so that it was surrounded by armed police officers.

186. Officer Tisdale obtained Mr. Pittman's insurance and registration and returned to his vehicle.

187. When Officer Tisdale returned to Mr. Pittman's vehicle, he asked Mr. Pittman if he was a gang member and demanded Mr. Pittman step out of his vehicle so he could search Mr. Pittman's person and vehicle for drugs and weapons.

188. Mr. Pittman exercised his rights and refused to consent to the unlawful search of his person and vehicle.

189. Mr. Pittman explained to Officer Tisdale that he did not have the authority or right to search his person or vehicle and refused to get out of his vehicle.

190. Officer Tisdale never offered any justification for his unlawful search and seizure of Mr. Pittman.

191. Officer Tisdale did not have reasonable suspicion, probable cause, or any other legal bases, to believe that Mr. Pittman had committed any weapons related crimes prior to or during the traffic stop, or that he was armed and dangerous.

192. After Mr. Pittman's refused consent to the unlawful search of his person and vehicle,

26

Officers Tisdale, Zimmerman, McElroy, and Spano unlawfully searched Mr. Pittman's person and vehicle for several minutes.

193. Officers Tisdale, Zimmerman, McElroy, and Spano, did not find anything illegal on Mr. Pittman's person or inside his vehicle.

194. Mr. Pittman was never charged with any crimes or traffic citations as a result of the April 3, 2019 incident.

195. Mr. Pittman filed a complaint with the Aurora Police Department regarding the incident on April 3, 2019.

196. The complaint was reviewed by Lieutenant Cerinich in Internal Affairs (the same officer who reviewed Mr. Pittman's complaint regarding the January 19, 2019 unlawful search and seizure), who determined that the officers' actions were lawful on April 3, 2019.

197. Specifically, Lieutenant Cerinich wrote that the "pat down search for weapons" on April 3, 2019 was "reasonable due to Pittman's status as [a] known gang member with a history of at least one weapons offense."

198. He therefore determined that no disciplinary action, training, or supervision was necessary.

199. Mr. Pittman filed a separate lawsuit in this District regarding the April 3, 2019 search, which is case number 19-cv-2209.

200. Upon information and belief, no officer has been disciplined, reprimanded, or received additional training as a result of the April 3, 2019 incident.


*6. Jerhon Falls – September 2, 2019, September 17, 2019, & November 29, 2019 Unlawful Searches and Seizures*

27

201. On three separate occasions between September and November 2019, City of Aurora police officers unlawfully searched and seized Jehron Falls' body and vehicle based solely on his race and criminal history, and without consent, reasonable suspicion, probable cause, or any other lawful basis.

202. Mr. Falls is an African American man.

On September 2, 2019, Mr. Falls was pulled over by City of Aurora police officers for allegedly failing to obey a signal light.

203. Officer Dustin Peterson obtained Mr. Falls' license, insurance, and registration, and returned to his patrol car to perform a background check.

204. Officer Peterson returned and demanded Mr. Falls step out of his vehicle.

205. When Mr. Falls refused, Officer Peterson opened his door, put him in a twist lock, and pulled him out of the vehicle. Officers Peterson, Ploch, and other unidentified officers searched Mr. Falls' body and vehicle without consent, probable cause, reasonable suspicion, or any other lawful basis.

206. Like Mr. Pittman, Officer Peterson told Mr. Falls that he was entitled to search his person and vehicle for drugs and guns because of his criminal history.

207. Just over two weeks later, on September 17, 2019, Mr. Falls was subjected to another traffic stop by City of Aurora officers, purportedly for having improperly attached license plate validation tabs.

208. Officer Jeremy McElroy (who was involved in the April 3, 2019 unlawful search and seizure of Mr. Pittman) obtained Mr. Falls' license, insurance, and registration, and returned to his patrol car to perform a background check on him.

209. A few minutes later, Officers McElroy and Ellis returned to Mr. Falls' vehicle, opened his

driver's-side door, put him in a twist lock, and pulled him out of the vehicle without warning.

210. Officers McElroy and Ellis searched Mr. Falls' person and vehicle without consent, probable cause, reasonable suspicion, or any other lawful basis.

211. Officer McElroy said that he had to search Mr. Falls' person and vehicle for drugs and guns because of his criminal history.

212. Nothing illegal was found during the searches, and Mr. Falls was allowed to leave with a traffic citation after being detained for nearly an hour.

213. Two months later, on November 29, 2019, Mr. Falls was again stopped by Aurora police officers, allegedly for having his headlights off when he pulled out of a parking lot.

214. Officer Rosenblatt obtained Mr. Falls' documents and returned to his patrol car to run a background check on Mr. Falls.

215. Officer Rosenblatt returned and ordered Mr. Falls out of his vehicle, but Mr. Falls refused so Officer Rosenblatt forcefully removed him from the vehicle.

216. Officers Rosenblatt and Spitzer then searched Mr. Falls' body and vehicle without consent, reasonable suspicion, probable cause, or any other lawful basis.

217. Officer Rosenblatt told Mr. Falls that he had to search his vehicle and body for drugs and guns because of his criminal history.

218. Again, nothing illegal was found in the search of Mr. Falls' body and vehicle.

219. Mr. Falls filed complaints with the Aurora Police Department's Internal Affairs Bureau regarding the three unlawful searches and seizures.

220. In response, the Bureau stated that the officers had done nothing wrong or ignored the complaints altogether.

221. Upon information and belief, no officer has been reprimanded, disciplined, re-trained, or

subjected to additional supervision as a result of the three unlawful searches and seizures of Mr.

Falls from September to November 2019.


**II. CLAIM TWO:** 42 U.S.C. § 1983-Fourth Amendment- Unlawful Search of Vehicle;

    Supporting facts:

222. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.

223. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

224. This claim two is being leveled against Defendants Tim King, Greta Salazar, Scott Baker, City of Aurora, Lt. Bell, Matthew Perez, Patrice Nixon, G. Mahr Jr., City & County of Denver, and John and Jane Doe Police Officers (to be determined), in their individual and official capacities, as employees of the City of Aurora and City and County of Denver.

225. The Fourth Amendment to the United States Constitution provides individuals with the right to be free from unreasonable searches of their property.

226. The right not to be subjected to a search of your vehicle without probable cause is clearly established.

227. Any reasonable person in the position of Defendants King, Salazar, Baker, Bell, Perez, Nixon, Mahr, and the John and Jane Doe Police Officers knew or should have known of this clearly established right.

228. Defendants King, Baker, Bell, and Perez violated Plaintiff's Fourth Amendment rights by searching his vehicle for several minutes without consent, reasonable suspicion, probable cause, or any other lawful basis.

229. The decision by Defendants King, Baker, Bell, and Perez to search Plaintiff's vehicle was not objectively reasonable in light of the circumstances confronting them.

230. Defendants Salazar, Nixon, Mahr, and the John and Jane Doe Police Officers failed to intervene in Defendants King, Baker, Bell, and Perez's unlawful search of Plaintiff's vehicle, despite knowing that Defendants King, Baker, Bell, and Perez were conducting the search without consent, reasonable suspicion, probable cause, or any other lawful basis.

231. Defendants Salazar, Nixon, Mahr, and the John and Jane Doe Police Officers knew Defendants King, Baker, Bell, and Perez had no legally based reason to believe, that Plaintiff was armed or dangerous, and knew that Defendants King, Baker, Bell, and Perez was only searching Plaintiff's vehicle because of his gang affiliation, criminal history, and race.

232. Defendants Salazar, Nixon, Mahr, and the John and Jane Doe Police Officers observed Defendants King, Baker, Bell, and Perez search Plaintiff's vehicle for several minutes.

233. The actions of Defendants King, Salazar, Baker, Bell, Perez, Nixon, Mahr, and the John and Jane Doe Police Officers were made in intentional, malicious, willful, and/or reckless disregard of Plaintiff's constitutional rights.

234. As a direct and proximate result of Defendants King, Baker, Bell, and Perez in conducting the unlawful search of Plaintiff's vehicle, and Defendants Salazar, Nixon, Mahr, and the John and Jane Doe Police Officers failing to intervene in the unlawful search, Plaintiff suffered emotional distress, humiliation, and dignitary injuries.

**CLAIM THREE:**    42 U.S.C. § 1983-Fourth Amendment-Wrongful Detention;

Supporting Facts:

235. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set forth

herein.

236. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

237. This claim three is being leveled against Defendants Tim King, Greta Salazar, Scott Baker, City of Aurora, Lt. Bell, Matthew Perez, Patrice Nixon, G. Mahr Jr., City & County of Denver, and John and Jane Doe Police Officers (to be determined), in their individual and official capacities, as employees of the City of Aurora and City and County of Denver.

238. Once Defendants King, Salazar, Baker, Bell, Perez, Nixon, Mahr, and John and Jane Doe Police Officers determined Plaintiff was the only person in the vehicle, wasn't their target, and didn't have any outstanding warrants, the purpose of the traffic stop was complete, and they should have returned his documents and allowed him to leave.

239. Instead of returning his documents, Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers impermissibly continued to detain Plaintiff, unlawfully extended the scope and duration of the stop, and transformed the stop into a criminal investigation and subsequent arrest.

240. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers intentionally and unlawfully extended the duration of the stop and transformed it into a criminal investigation by surrounding Plaintiff's vehicle in strategic positions with their weapons drawn and pointed at Plaintiff.

241. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers wrongfully seized, detained, and confined Plaintiff by forcing him out of his vehicle at gunpoint and forcing him to sit on the ground for an additional 50 minutes after the purpose of the traffic stop was complete, surrounded by several armed police officers without consent,

32

reasonable suspicion, probable cause, or any other lawful basis.

242. During this time, Plaintiff was confined by Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers, within a limited space, enforced by obstructive and forceful acts, and not permitted to leave.

243. A reasonable person in Plaintiff's circumstances, when surrounded by several armed police officers ordering him to stay on the ground, would not have felt free to leave.

244. The actions described herein of Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers, deprived Plaintiff of the rights, privileges, liberties, and immunities protected by the Constitution of the United States of America, including the right to freedom from unreasonable seizure as guaranteed by the Fourth Amendment.

245. As a direct and proximate result of the actions of Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers, in conducting and enforcing this unlawful seizure, Plaintiff suffered emotional distress, humiliation, and dignitary injuries.


**CLAIM FOUR:**    42 U.S.C. § 1983-Fourth Amendment-Excessive Force;

Supporting Facts:

246. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.

247. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

248. This claim four is being leveled against Defendants Tim King, Greta Salazar, Scott Baker, City of Aurora, Lt. Bell, Matthew Perez, Patrice Nixon, G. Mahr Jr., City & County of Denver, and John and Jane Police Officers (to be determined), in their individual and official capacities,

as employees of the City of Aurora and City and County of Denver.

249. Plaintiff had a protected Fourth and Fourteenth Amendment interest against being unreasonably seized and victimized by the use of excessive force at the hands of law enforcement personnel.

250. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers never at any time had a legally valid basis to seize Plaintiff under the circumstances and in the manner described more fully herein.

251. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers unlawfully seized Plaintiff by means of excessive physical force.

252. Defendants King, Baker, Salazar, Bell, Perez, Mahr and the John and Jane Doe Police Officers had no warrant authorizing any seizure of Plaintiff.

253. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers actions were objectively unreasonable in light of the circumstances confronting them.

254. Plaintiff had committed no crime nor could Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers have reasonably believed he had committed any crime, to legally justify the use of such force,

255. Plaintiff gave Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers no reason to fear for their or anyone else's safety, and he was not resisting arrest or fleeing.

256. Accordingly, Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers act of pointing guns at Plaintiff, constituted excessive force.

257. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate

34

indifference and reckless disregard for Plaintiff's constitutionally protected rights.

258. Defendant Aurora failed to properly train, supervise, and/or discipline its employees regarding the proper use of physical restraint and force, resulting in the use of excessive force.

259. Defendant Aurora particularly failed to properly train, supervise, and/or discipline its employees regarding the constitutional limits on use of force, particularly regarding how to avoid engaging in racially biased or disproportionately aggressive policing as set forth below in Sections C and D.

260. Defendants King, Baker and Salazar were engaged in these acts pursuant to formal or informal custom, policy and practice of Defendant Aurora, which encourages, condones, tolerates, and ratifies the unlawful use of force by law enforcement officers, as set forth below in Sections C and D.

261. This formal or informal custom, policy and practice of Defendant Aurora is so permanent and well settled as to constitute custom and has been ratified by final policymakers.

262. Plaintiff has been and continues to be damaged by the Defendants unreasonable seizure and use of excessive force.

263. Plaintiff has endured and continues to endure mental pain, including humiliation, fear, anxiety, some loss of enjoyment of life, a fear of a loss of liberty,

privacy, and sense of security and individual dignity, among other injuries, damages, and losses.

264. Defendants acts or omissions described herein, including the unconstitutional policy, procedure, custom and/or practice described herein, were the legal and proximate cause of all Plaintiff's damages.

265. At the time when Defendants unlawfully seized him, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure

35

in his person from unreasonable seizure through excessive force.

266. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers are not entitled to Qualified (or any other) Immunity.

267. Any reasonable law enforcement officer knew or should have known of this clearly established right.

268. Defendants actions, as described above, were motivated by intent to harm Plaintiff.

269. Defendants actions, as described herein, were undertaken intentionally,

maliciously, willfully, wantonly, and/or in reckless disregard of all Plaintiff's federally protected rights.


**C. Aurora's unconstitutional customs, policies, and/or practices are demonstrated by statistics that Aurora Police are more likely to use force against Black people and people of color, even though Black people and people of color comprise a minority of the Aurora population.**


270. APD targets Black people and people of color and subjects them to greater force as compared with other members of the Aurora community.

271. For example, from January 2013 through December 2019, the Aurora Police Department ranked 8th out of the 100 largest cities in the United States for most police killings per capita.

272. During that same period, APD killed Black people at 4 times the rate it killed white people. See Police Accountability Tool, https://mappingpoliceviolence.org/cities.

273. Statistical analysis of APD's recent history with Black people and people of color also demonstrates the widespread, systemic nature of APD's unconstitutional pattern of using force

against Black people and people of color.

274. Statistical analyses show that a statistically significant racial disparity exists in APD's use of force against Black people in comparison to its rate of using force against Whites and other races. See July 14, 2020, Report by Dr. Lance Kaufman of Bardwell Consulting Ltd.

275. Statistics show that APD's use of force per arrest is 1.26 times greater against Black arrestees than against arrestees of other races.

276. APD's deadly and injurious use of force per arrest is 1.43 times greater against Black arrestees than against arrestees of other races.

277. APD's use of Taser weapons per arrest is 1.40 times greater against Black arrestees than against arrestees of other races.

278. APD's use of force per arrest was also higher against Black arrestees in comparison to White arrestees.

279. Black people arrested by APD thus had a disproportionately high risk of experiencing use of force in comparison to Whites and other races. Id.

280. In 2017, APD's rate of use of force per person was 5.5 times greater against Black people than people of other races. Id.

281. Departmental data similarly showed that in 2019, almost half of the people against whom APD officers used force were Black, even though Black people only make up 16% of Aurora's population.

282. Statistics show that Black people present no higher risk of officer injury during arrest than White arrestees, meaning that risk to officers does not explain APD's higher use of force against Black people relative to Whites. Id.

283. Despite the consistently disproportionate use of force against Black people, the percentage

of Black people whom APD officers have used force against has stayed between 38% and 53%
of all APD uses of force since 2014.

284. Aurora's annual use of force reports do not attempt to explain or understand the persistent
disparately negative treatment of Black people over the course of many years.

**D. Aurora's Unconstitutional Customs, Policies, and/or Practices are Demonstrated by
Many Incidents of Unconstitutional Brutality by APD, Against Black Victims, and
Racially-Biased Policing by APD.**

285. In addition, many other instances of Defendant Aurora's similar constitutional violations
show that use of excessive force by APD officers, against Black people and other people of
color, is customary and the standard operating procedure in the City of Aurora, as is racially-
biased policing.

286. This pernicious, racist custom and practice persists today.

*1. Brittany Gilliam - August 2, 2020 Unlawful Search and Seizure - Excessive Force*

287. For example, on August 2, 2020, APD officers detained and handcuffed Brittany Gilliam, a
Black woman, and four Black children, including her six-year-old daughter, at gunpoint after
supposedly mistakenly identifying Ms. Gilliam's car as a stolen motorcycle.

288. APD officers pointed guns at the children and forced them to exit the car and lie on their
stomachs.

289. The officers handcuffed two of the children behind their backs.

38

290. The officers likewise forced Ms. Gilliam to exit the car at gunpoint, handcuffing her and placing her in the back of a patrol vehicle.

291. Video footage of the stop shows the children crying hysterically while surrounded by police officers.

292. The use of force by the officers was clearly excessive, and obviously motivated by racial profiling.

*2. Dr. P. J. Parmar - March 1, 2020 Unlawful Search and Seizure - Excessive Force*

293. On March 1, 2020, an APD officer confronted Dr. P.J. Parmar, a person of color, when Dr. Parmar arrived at his business.

294. As Dr. Parmar drove up to his garage, he found an APD officer parked on his property.

295. Dr. Parmar stopped immediately and honked.

296. At that point, the officer jumped out of his car and swore at Parmar.

297. The officer then pulled out his gun while running toward Dr. Parmar's car.

298. The officer pointed his gun at Dr. Parmar's head without having any reason to believe that Dr. Parmar was committing or had committed a crime, or posed any threat to the officer or anyone else.

299. Dr. Parmar calmly and repeatedly asked the officer to leave his property, to which the officer repeatedly demanded—without any legal justification—that Dr. Parmar proved that it was his property.

300. Instead of leaving, the officer called in two other APD officers.

301. APD had no reasonable suspicion, much less probable cause for its officers' seizure of Dr.

Parmar which was clearly motivated by racial profiling.


*3. Elijah McClain - August 24, 2019 Unlawful Search and Seizure - Excessive Force*


302. On August 24, 2019, APD police officers approached 23-year-old Elijah McClain as he walked home from a convenience store.

303. Elijah was detained on his way home from a convenience store after picking up an iced tea for his brother.

304. The APD later said that a 911 caller had reported a "suspicious person" in a ski mask, and that when officers Nathan Woodyard, Jason Rosenblatt and Randy Roedema confronted Elijah — who was not armed and had not committed any kind of crime — he "resisted arrest."

305. In the 15 minutes that followed, the officers tackled Mr. McClain to the ground, put him in a carotid hold, and called first responders, who injected him with ketamine.

306. He had a heart attack on the way to the hospital, and died days later, after he was declared brain dead.

307. McClain's family maintains that law enforcement's use of excessive force led to his death.

308. The officers, however, were subsequently cleared of wrongdoing, apparently on the basis of questionable body-camera footage and an allegedly inconclusive autopsy.

309. Mr. McClain's case has attracted renewed scrutiny amid national protests against systemic racism and the deadly tactics that police often deploy against Black people.


*4. Shataean Kelly - August 27, 2019 Unlawful Search and Seizure - Excessive Force*

310. On August 27, 2019, just days after APD killed Elijah McClain, APD Officer Levi Huffine arrested an unidentified Black woman for a suspected municipal code violation.

311. Officer Huffine handcuffed the woman and left her hobbled in the back of his patrol car.

312. At some point, the woman slipped so that she was inverted and her head was at the floor of the patrol car in a dangerous and exceedingly uncomfortable position.

313. Though the woman begged Officer Huffine for help, telling him repeatedly that she could not breathe, that her neck was breaking, and that she didn't want to die this way, Officer Huffine ignored her pleas, leaving her in the dangerous, painful position for approximately 21 minutes.

314. Officer Huffine did not so much as look at her as he drove.


*5. Jamie Alberto Torres - November 21, 2018 Unlawful Search and Seizure - Excessive Force*


315. On November 21, 2018, Jamie Alberto Torres was fixing a car in his garage with friends when a neighbor complained about noises coming from the garage.

316. APD officers came to Mr. Torres' home solely to investigate this noise complaint, and one of the officers illegally ordered Mr. Torres to exit his garage, threatening to take him to jail.

317. Because Mr. Torres paused momentarily before complying with the illegal order, the officer grabbed Mr. Torres, wrenched his arm behind his back, picked him up, and slammed him to the ground.

318. Even after handcuffing Mr. Torres, the officer continued to attack Mr. Torres by slamming him to the ground again and wrenching his arm behind his back multiple times.

319. During this encounter, Mr. Torres repeatedly screamed in pain.

320. To justify their illegal conduct, the APD officers charged Mr. Torres with resisting arrest

41

and failure to obey a lawful order.

321. A jury found that Mr. Torres was not guilty of these charges at trial.

322. The APD investigated its officers' use of force against Mr. Torres but, as is customary, found no wrongdoing.

323. A lawsuit based on this incident, claiming excessive force and racial bias, among other things, is ongoing.

*6. Andre Williams - September 6, 2018 Unlawful Search and Seizure - Excessive Force*

324. On September 6, 2018, APD officers used excessive force when, after responding to a car accident involving Andre Williams, a Black man.

325. The officers beat and tased Mr. Williams for not responding immediately to their order.

326. Even though Mr. Williams showed no signs of aggression or attempting to flee, and in fact was having a seizure, the officers took him to the ground.

327. After Mr. Williams had complied with an order to get on his stomach and at least three APD officers punched him in the head, struck his legs with their knees, and tased him twice.

328. A lawsuit based on this incident, claiming excessive force and racial bias, among other things, is ongoing.

*7. Vanessa Peoples - July 13, 2017 Unlawful Search and Seizure - Excessive Force*

329. On July 13, 2017, one APD officer choke-slammed Vanessa Peoples, a Black woman, while

42

police were performing a welfare check in her home.

330. Several other APD officers then piled on Ms. Peoples.

331. What "provoked" the officers' attack was Ms. Peoples' protestations of the officers' misconduct and her failure to be 100% compliant with every single police directive (legal or illegal).

332. Eventually, the officers hog-tied Ms. Peoples so tightly that they dislocated her shoulder.

333. Despite Ms. Peoples' continued cries of pain, APD officers kept her hog-tied for 30 minutes with her shoulder dislocated.

334. APD officers had no reason to believe Ms. Peoples had committed a crime; yet they charged her with obstruction. Those charges were later dismissed.

335. Ms. Peoples settled her potential claims against Aurora for $100,000 pre-litigation.

336. Aurora did not discipline any of the involved officers for their unconstitutional actions.

*8. Brandon Washington - April 22, 2017 Unlawful Search and Seizure - Excessive Force*

337. On April 22, 2017, multiple APD officers responded to a car accident that involved Brandon Washington, a Black man.

338. When Mr. Washington, who had hit his head on his vehicle's steering wheel during the crash, dazedly attempted to stand up out of his vehicle, the officers used excessive force by tasing him repeatedly and subjecting him to a variety of other unwarranted physical force, hospitalizing him.

339. Aurora did not discipline any of the involved officers for their unconstitutional actions.

340. A lawsuit based on this incident, claiming excessive force and racial bias, among other

things, is ongoing.


*9. Dennis Seabaugh - September 14, 2016 Unlawful Search and Seizure - Excessive Force*


341. On September 14, 2016, an APD officer used unwarranted excessive force against Dennis Seabaugh while Mr. Seabaugh was detained in an Aurora jail cell.

342. After getting frustrated with Mr. Seabaugh's repeated but ineffectual attempts to hang himself by tying a t-shirt around his neck, the officer stormed into the cell, and without providing Mr. Seabaugh reasonable warning, command, or an opportunity to comply, the officer got on top of Mr. Seabaugh and smashed his head down while simultaneously applying his body weight to pin Mr. Seabaugh down.

343. The officer then smashed Mr. Seabaugh's face into a bench in the cell multiple times, while yanking on his arms.

344. Ultimately, the officer used so much force pulling on one of Mr. Seabaugh's arms that he broke Mr. Seabaugh's humerus bone.

345. Aurora settled Mr. Seabaugh's excessive force lawsuit based on the incident.



*10. Julian Campbell - August 12, 2016 Unlawful Search and Seizure - Excessive Force*


346. On August 12, 2016, two APD officers responding to a report of a Black man with a gun ordered several occupants out of a residence, including then-minor Julian Campbell, who was Black.

347. Mr. Campbell came outside as commanded, and subsequently obeyed all orders the APD officers gave.

348. Nonetheless, the officers grabbed him, slammed him to the ground, handcuffed him, and cited him for disobeying a lawful order.

349. During the subsequent criminal trial of Mr. Campbell, the court granted a motion for judgment of acquittal at the end of the prosecution's case.

350. A lawsuit based on this incident asserting, among other things, excessive force and racial bias against Aurora and the individual APD officers is ongoing.

*11. Darsean Kelley - February 19, 2016 Unlawful Search and Seizure - Excessive Force*

351. On February 19, 2016, Aurora officers stopped and detained Darsean Kelley simply because he was a Black man who happened to be in the vicinity of a reported crime.

352. He questioned the officers' orders and demanded to know whether or not he was being detained.

353. Mr. Kelley complied with officers' orders but also asserted "I know my rights," just as one officer tased him in the back.

354. The Aurora officers conducting the stop had no reason to believe that Mr. Kelley had committed any crime or was armed or dangerous.

355. To cover up the illegal stop and the unjustified tasing, Aurora charged Mr. Kelley with failure to follow a lawful order.

356. That charge was eventually dismissed, but Aurora found no misconduct and did not discipline any of the officers involved in this unconstitutional detention and use of excessive

force.

357. Aurora paid Mr. Kelley $110,000 to settle his legal claims pre litigation.

*12. OyZhana Williams - December 22, 2015 Unlawful Search and Seizure - Excessive Force*

358. On December 22, 2015, several APD officers assaulted OyZhana Williams, a Black woman, who was simply visiting her boyfriend in the hospital.

359. When Ms. Williams refused the officer's illegal order that she give him the keys to her car, the officer tackled Ms. Williams, choked her, slammed her head against the ground, and then stomped on her head.

360. Aurora officers had no probable cause or reasonable suspicion to believe Ms. Williams had committed any crime.

361. Yet, to cover up their excessive use of force, the officers charged Ms. Williams with a crime and arrested her. The charges were dismissed.

362. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions.

363. Aurora paid over $350,000 to settle Ms. Williams' claims.

*13. Dwight Crews - November 14, 2015 Unlawful Search and Seizure - Excessive Force*

364. On November 14, 2015, two Aurora officers ordered Dwight Crews, a 60-year-old, disabled Black man, out of his home under threat of force, despite the fact that the officers had no warrant and no legal justification to effect a warrantless arrest in the home.

365. After Mr. Crews complied, the officers forcefully threw him to the ground because he had momentarily delayed complying with their illegal commands in order to prevent his cat from getting out of his house.

366. To cover up their unconstitutional conduct, the Aurora officers charged Mr. Crews with resisting arrest.

367. The judge dismissed the charge halfway through Mr. Crews' trial.

368. Upon information and belief, Aurora did not discipline the involved officers for their unconstitutional treatment of Mr. Crews.

369. Aurora paid Mr. Crews to settle his legal claims.

*14. Jeffrey Gale - June 29, 2015 Unlawful Search and Seizure - Excessive Force*

370. On June 29, 2015, APD officers used excessive force against Jeffrey Gale, an unarmed Black man, after a bystander called 911 to report that Mr. Gale had attempted to steal someone's wallet.

371. The bystander reported to the 911 dispatcher that no physical force, threats, or weapon were used in the attempted theft.

372. Mr. Gale was 49 years old, 5'7", weighed approximately 150 pounds, and suffered from gout in both ankles.

373. After locating Mr. Gale, two APD officers handcuffed him then forced him to the ground, kicking him in the head and back.

374. Five more APD officers joined in to hogtie Mr. Gale.

375. After he was handcuffed, hogtied, and lying face-down on the ground, the officers tased Mr.

47

Gale at least three times, both in the back of his ribs and the back of his head.

376. A later medical evaluation showed Mr. Gale suffered from metabolic acidosis from the tazing.

377. All of the officers' body cams were turned off or the tapes destroyed, with the exception of a small portion of video from one officer after Mr. Gale was hogtied.

378. Although Mr. Gale could not be seen during most of this one recording, he could be heard crying out in pain and begging for the officers to stop.

379. One officer responded to his cries of pain by saying, "You better shut the fuck up or this is going to get really ugly for you."

380. Aurora settled an excessive force lawsuit brought by Mr. Gale based on this incident.

*15. Naeschylus Vinzant-Carter - March 6, 2015 Unlawful Search and Seizure - Excessive Force*

381. On March 6, 2015, an Aurora police officer used excessive force in the unjustified shooting and killing of Naeschylus Vinzant-Carter, an unarmed Black man.

382. Mr. Vinzant-Carter was being pursued by Aurora's SWAT team, near an elementary school, when he was confronted.

383. One officer then opened fire, killing Mr. Vinzant-Carter.

384. Aurora paid $2,600,000 to settle Mr. Vinzant-Carter's claims.

385. Upon information and belief, Aurora did not discipline any of the involved officers for this use of excessive force.

**CLAIM FIVE:     42 U.S.C. § 1983- Fourteenth Amendment-Excessive Force;**

48

Supporting Facts:

386. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.

387. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

388. This claim five is being leveled against Defendants Tim King, Greta Salazar, Scott Baker, City of Aurora, Lt. Bell, Matthew Perez, Patrice Nixon, G. Mahr Jr., City & County of Denver, and John and Jane Doe Police Officers (to be determined), in their individual and official capacities, as employees of the City of Aurora and City and County of Denver.

389. Plaintiff had a protected Fourteenth Amendment Substantive Due Process interest against being unreasonably harmed by the use of excessive force at the hands of law enforcement personnel.

390. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers did not have, at any time, a legally valid basis to use force against Plaintiff.

391. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers acts of pointing their loaded firearms at Plaintiff constituted outrageously excessive force.

392. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers use of force was extremely disproportionate.

393. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers acted with malice and/or excessive zeal amounting to an abuse of power.

394. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers acted for the purpose of causing harm unrelated and unnecessary to any relevant

49

policing objective.

395. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers actions were arbitrary and/or conscience shocking in light of the circumstances confronting them.

396. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally-protected rights.

397. At the time when Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers used excessive force against Plaintiff, he had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be secure from excessive force.

398. Any reasonable law enforcement officer knew or should have known of this clearly established right.

399. Defendant Aurora failed to properly train, supervise, and/or discipline its employees regarding the constitutional requirement not to use excessive force, resulting in the Defendants use of excessive force.

400. Defendant Aurora particularly failed to properly train, supervise, and/or discipline its employees regarding the proper use of force as is set forth more fully above in Sections C and D.


**CLAIM SIX:    42 U.S.C. § 1983- Fourteenth Amendment-Equal Protection;**

Supporting Facts:

401. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.

402. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

403. This claim five is being leveled against Defendants Tim King, Greta Salazar, Scott Baker, City of Aurora, Lt. Bell, Matthew Perez, Patrice Nixon, G. Mahr Jr., City & County of Denver, and John and Jane Doe Police Officers (to be determined), in their individual and official capacities, as employees of the City of Aurora and City and County of Denver.

404. At the time of the complained of events, Plaintiff had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

405. Plaintiff's race was a motivating factor in Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers decision to unlawfully detain him beyond the scope of the traffic stop, use of excessive force, and in the decisions regarding how much force to use against him.

406. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers acted with the purpose of depriving Plaintiff of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of the Fourteenth Amendment.

407. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers treated Plaintiff less favorably than similarly situated white counterparts, wholly or in part because of his race.

408. There was no rational basis for Defendants discriminatory actions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

409. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police

Officers used excessive force against Plaintiff, as described herein,

without reasonable suspicion or probable cause to believe Plaintiff had committed a crime or posed a threat of harm or fleeing that would legally justify the level of force used.

410. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers intentionally, willfully, unreasonably and wantonly seized Plaintiff by using excessive force against him, as described herein, wholly or in part due to Plaintiff's race.

411. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers actions were objectively unreasonable in light of the facts and circumstances confronting them.

412. Defendants King, Baker, Salazar, Bell, Perez, Mahr, and the John and Jane Doe Police Officers engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to and reckless disregard of Plaintiff's federally protected constitutional rights.

413. Defendant Aurora failed to properly train, supervise, and/or discipline its employees regarding the constitutional requirement not to engage in racially biased policing, resulting in Defendants unlawful seizure of Plaintiff and use of excessive force. as is set forth more fully above in Sections A, B, C and D.

414. Defendant Aurora particularly failed to properly train, supervise, and/or discipline its employees regarding the proper use of physical restraint and force against people of color, and the prohibition on using racially biased excessive force as is set forth more fully above in Sections A, B, C and D.

415. Defendants King, Baker, and Salazar was engaged in these acts pursuant to the formal or informal custom, policy and practice of Defendant Aurora, which encourages, condones, tolerates, and ratifies the unlawful use of racially discriminatory force by law enforcement

officers, as set forth above in detail in Sections A, B, C and D.

416. This formal or informal custom, policy and practice of Defendant Aurora is so permanent and well settled as to constitute custom and has been ratified by final policymakers.

417. Aurora's inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Aurora.

418. In light of the duties and responsibilities of personnel of Defendant Aurora, who must police and interact with people of color on a regular basis, the need for specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Aurora is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

419. Such failure to properly train, supervise, and/or discipline was a moving force behind and proximate cause of Defendants King, Baker, and Salazar's racially biased treatment of Plaintiff, and constitutes an unconstitutional policy, procedure, custom, and/or practice.

420. Defendant Aurora's failure to train and/or supervise, as described herein, was a legal and proximate cause of Plaintiff's injuries.

421. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

**E.     REQUEST FOR RELIEF**

*State the relief you are requesting or what you want the court to do. If additional space is
needed to identify the relief you are requesting, use extra paper to request relief. Please indicate
that additional paper is attached and label the additional pages regarding relief as "E.
REQUEST FOR RELIEF."*

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor
and against Defendants, and award him all relief as allowed by law and equity, including, but not
limited to the following:

a. Declaratory relief and injunctive relief, as appropriate;

b. Actual economic damages as established at trial;

c. Compensatory damages, including, but not limited to those for past and future

pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear,

anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security

and individual dignity, and other non-pecuniary losses;

d. Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e. Issuance of an Order mandating appropriate equitable relief, including but not limited to:

i. Issuance of a formal written apology from each Defendant to Plaintiff;

ii. The imposition of appropriate policy changes designed to avoid future similar
misconduct by Defendants;

iii. Mandatory training designed to avoid future similar misconduct by Defendants;

iv. Imposition of disciplinary action against appropriate employees of Aurora and
Denver;

f. Pre-judgment and post-judgment interest at the highest lawful rate;

g. Attorney's fees and costs; and

h. Such further relief as justice requires.


PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

## F.   PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

(Plaintiff's signature)

11-4-20

(Date)

(Form Revised December 2017)

1. Rozman
4676 Window G
Denver, Co
         80249

Legal Mail

United States District Court
901 19th Street
Denver, Co
        80294

$3.00 [1]
US POSTAGE
FIRST-CLASS
9625169 19585
80249
0100246662
S9924Z-148

