IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03371-PAB-NRN

TEDDY T. PITTMAN,

Plaintiff,

v.

TIM KING,
GRETA SALAZAR,
SCOTT BAKER,
CITY OF AURORA,
LIEUTENANT BELL,
MATTHEW PEREZ,
PATRICE NIXON,
G. MAHR, JR.,
CITY & COUNTY OF DENVER, and
JOHN AND JANE DOES,

Defendants.

---

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTIONS TO DISMISS (Dkt. ##17, 18, 36, & 39)

---

## N. REID NEUREITER
## United States Magistrate Judge

This case is before the Court pursuant to Orders (Dkt. ##17, 37, & 40) issued by

Chief Judge Philip A. Brimmer referring four motions:

1. Defendants Lieutenant Joel Bell, Sergeant Glenn Mahr, Jr., Matthew Perez, and

   Patrice Nixon in their individual capacities' (collectively, the "Individual Denver

   Defendants") Motion to Dismiss Plaintiff's Complaint (Dkt. #17);

2. Defendant City and County of Denver ("Denver") and the Individual Denver

   Defendants in their official capacities' Motion to Dismiss (Dkt. #18);

3. Defendant City of Aurora ("Aurora") and Defendants Tim King, Greta Salazar, and Scott Baker (collectively, the "Individual Aurora Defendants") in their official capacities' Motion to Dismiss (Dkt. #36); and

4. The Individual Aurora Defendants in their individual capacities' Motion for Partial Dismissal (Dkt. #39).

Plaintiff Teddy Pittman filed responses (Dkt. ##34, 44, & 49), [1] and the Defendants filed replies (Dkt. ##43, 48, & 50). On April 20, 2021, The Court heard argument on the subject motion. (*See* Dkt. #51.) The Court has taken judicial notice of the Court's file and considered the applicable Federal Rules of Civil Procedure and case law. Now, being fully informed and for the reasons discussed below, it is

**RECOMMENDED** that the subject motions be **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND[2]

### I. Mr. Pittman's Complaint

This lawsuit arises from a traffic stop that occurred on April 24, 2020. At about 4:30 that afternoon, Mr. Pittman was driving home from a friend's house in Aurora when he noticed he was being followed by multiple unmarked police vehicles. These vehicles belonged to members of the FBI Rocky Mountain Safe Streets Task Force (the "Task Force"). Mr. Pittman had no outstanding warrants and had not committed any crime. He believes that Task Force members were harassing him due, at least in part, to his then-

---

[1] Mr. Pittman did not file a response to Denver's Motion to Dismiss.

[2] Unless otherwise noted, all allegations are taken from Mr. Pittman's Complaint (Dkt. #1) and are presumed to be true for the purposes of this motion to dismiss. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

pending litigation against City of Aurora and Aurora Police Department ("APD") officers.[3]

The Task Force members followed Mr. Pittman for about 10 miles before finally pulling him over. Task Force members converged on Mr. Pittman's truck, guns drawn, and Defendant Salazar ordered him to get out, lay flat on the ground, and crawl towards her. Mr. Pittman complied. Defendants Baker and Perez approached the vehicle and saw no passengers, weapons, or evidence of criminal activity. Defendant Salazar put handcuffs on Mr. Pittman and performed a pat down search of his body. Nothing was found. Defendant Perez asked Mr. Pittman if he had a gun in the vehicle, which Mr. Pittman denied, and took his identification to check for warrants, which came back clear.

In the meantime, Defendant Baker had returned to the vehicle and exclaimed that a gun was in a Crown Royal bag on the driver side door. Mr. Pittman knew this was false because that bag only contained change. Defendants King and Baker leaned into the truck and moved the Crown Royal bag, confirming that it did not contain a gun. Mr. Pittman refused to give Defendant Baker permission to search the truck. Because Mr. Pittman was allegedly driving under suspension, he told Defendant Baker to release the vehicle to his girlfriend, who was present at the scene. Defendants Bell, Baker, and King searched the vehicle anyway. No drugs, guns, or evidence of a crime were found in Mr. Pittman's vehicle.

Although Defendant King told Mr. Pittman that they were going to tow his truck, after about an hour, Mr. Pittman was allowed to leave, and the vehicle was released to

---

[3] *See Pittman v. City of Aurora et al.*, 19-cv-01947-PAB-NRN (D. Colo), and *Pittman v. City of Aurora et al.*, 19-cv-02209-PAB-NRN (D. Colo.). Both cases have recently settled.

his girlfriend. During that hour, he was searched on three separate occasions, and when he was not being searched, he was forced to sit on the ground with his hands cuffed behind his back. When he demanded an explanation from the officers, he was told that they believed a fugitive wanted for robbery was in his vehicle because the fugitive's cell phone was ringing in it. [4] However, Mr. Pittman claims that the officers knew, because they had surveilling him for hours before the actual stop, that no one was in the vehicle with him.

Defendant Salazar cited Mr. Pittman for an illegal turn and driving under suspension. Those charges were later dismissed. Mr. Pittman filed administrative complaints with the APD and the Denver Police Department ("DPD"). No action was taken by either department as to any of the officers.

Mr. Pittman asserts six claims for relief pursuant to 42 U.S.C. § 1983 against all Defendants, in their individual and official capacities.

- **Claim One** is brought pursuant to the Fourth Amendment for violating Mr. Pittman's right to be free from unreasonable searches and seizures of his person.

- **Claim Two** is brought pursuant to the Fourth Amendment for violating Mr. Pittman's right to be free from unreasonable searches and seizures of his vehicle.

- **Claim Three** is a Fourth Amendment wrongful detention claim.

---

[4] The Complaint states that Mr. Pittman was told the cell phone was "ringing" in his vehicle. The Individual Denver Defendants say that the phone was "pinging" in the vehicle. The latter makes more sense, but this discrepancy does not affect the Court's analysis.

- **Claim Four** is a Fourth Amendment excessive force claim.

- **Claim Five** is a Fourteenth Amendment excessive force claim.

- **Claim Six** is a Fourteenth Amendment equal protection claim.

## LEGAL STANDARDS

### I. Pro Se Litigants

Mr. Pittman proceeds pro se. Accordingly, the Court "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted). However, a pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *see also Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (the court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues"). A plaintiff's pro se status does not entitle him to an application of different rules. *See Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

### II. Motion to Dismiss Under Rule 12(b)(6)

Rule 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's

function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall*, 935 F.2d at 1198. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs of analysis. First, the Court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id*. at 679–81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 679.

However, the Court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*,

556 U.S. at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

### III. Section 1983 and Qualified Immunity

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 creates a "species of tort liability" that provides relief to persons deprived of rights secured to them by the Constitution. *Carey v. Piphus*, 435 U.S. 247, 253 (1978) (quotations omitted).

In suits brought against officials in their individual capacities, officials may raise the defense of qualified immunity. *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985). The doctrine of qualified immunity protects government officials from individual liability in the course of performing their duties so long as their conduct does not violate clearly established constitutional or statutory right*s. Washington v. Unified Gov't of Wyandotte Cty.*, 847 F.3d 1192, 1197 (10th Cir. 2017). Once a defendant has asserted a defense of qualified immunity, the burden shifts to the plaintiff who must establish that (1) the defendant violated a right, and (2) the right was clearly established. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015). A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from

other courts shows that the right must be as the plaintiff maintains." *Washington*, 847 F.3d at 1197 (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted)).

A qualified immunity defense may be asserted in a Rule 12(b)(6) motion, although a motion for summary judgment under Rule 56 is the more common vehicle for asserting such defenses. *See Peterson v. Jensen*, 371 F.3d 1199, 1202 (10th Cir. 2004). In asserting a qualified immunity defense in their Rule 12(b)(6) motion, Defendants have set a higher bar for themselves; "a district court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Jensen*, 371 F.3d at 1202 (internal quotations and citations omitted). In sum, asserting a defense of qualified immunity shifts the burden to the plaintiff, but doing so in the context of a 12(b)(6) motion materially lessens that burden.

## ANALYSIS

### I. Official Capacity Claims

Mr. Pittman asserts claims against both the Individual Aurora and Denver Defendants in their official capacities and the cities of Aurora and Denver. "[A] section 1983 suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same." *Stuart v. Jackson*, 24 F. App'x. 943, 956 (10th Cir. 2001) (quoting *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998)). Accordingly, where a plaintiff sues both the municipality and municipal official in an official capacity under the same theory of recovery, courts have dismissed the official capacity claim as "duplicative" or "redundant" of the claim against the municipal entity.

*See Leadholm v. City of Commerce City*, No. 16-cv-02786-MEH, 2017 WL 1862313, at *5 (D. Colo. May 9, 2017). The official capacity claims against the Individual Defendants should be dismissed.

## II. Individual Capacity Claims

### a. The Individual Aurora Defendants

The Individual Aurora Defendants seek dismissal of Mr. Pittman's equal protection claim.[5] In *Whren v. United States*, 517 U.S. 806 (1996), the Supreme Court held that claims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause. 517 U.S. at 813. The fundamental guarantee of the Equal Protection Clause is that "all persons similarly situated shall be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). To adequately plead an equal protection claim, Mr. Pittman must allege facts that Defendants treated him differently from others similarly situated. *Id.* "Individuals are 'similarly situated' only if they are alike 'in all relevant respects.'" *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (quoting *Coal. for Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008)). To state a claim of racially selective law enforcement, Mr. Pittman also must demonstrate that Defendants' actions had a "discriminatory effect and were motivated by a discriminatory purpose." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003). "The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision." *Id.* "[T]here need not be direct evidence of discriminatory purpose;

---

[5] The Individual Aurora Defendants filed an Answer (Dkt. #38) to Mr. Pittman's claims relating to the allegedly unconstitutional searches, wrongful detention, and excessive force.

discriminatory purpose can be shown with purely circumstantial evidence." *Blackwell v. Strain*, 496 F. App'x 836, 844 (10th Cir. 2012).

At this early stage of litigation, the Court finds that Mr. Pittman has stated a Fourteenth Amendment claim against the Individual Aurora Defendants. Mr. Pittman has adequately alleged that the initial stop was racially motivated, at least in regard to Defendant King. He claims that Defendant King had seen him earlier in the night and the two were familiar with each other, so Defendant King knew Mr. Pittman was African American. Mr. Pittman alleges that Defendant King then surveilled Mr. Pittman as he drove around town and did not observe anyone getting into or out of his vehicle, so the officers' later explanation for stopping him—that a fugitive wanted for robbery was in the vehicle—was a deliberate falsehood. Defendant King eventually ordered Defendant Baker to conduct first a routine, and then a felony traffic stop, before Mr. Pittman was observed breaking any traffic laws. Defendant Baker, in turn, instructed Defendant Salazar to make the stop, and she pulled Mr. Pittman over for making an illegal turn, which Mr. Pittman denies doing. The citations for driving under suspension and making an illegal turn were later dismissed. Accepting these allegations as true, Mr. Pittman plausibly alleges that the decision to pull him over was pretextual. *See Marshall*, 345 F.3d at 1169 (plaintiff's testimony that he did not commit a traffic violation evidence of pretext).

Mr. Pittman also claims that he was detained, searched, and subjected to excessive force due to his race. Once he was pulled over and ordered out of the car, Defendants Salazar and Baker were aware of Mr. Pittman's race. They and the officers drew their guns on him, although he had only been stopped for making an illegal turn.

Defendant Salazar's search of Mr. Pittman's person turned up no drugs or evidence of a crime. Defendant Salazar also confirmed that Mr. Pittman had no outstanding warrants and was told by another officer that "he wasn't their target." Moreover, according to Mr. Pittman, Defendant Baker confirmed that there were no other passengers in the vehicle. But Mr. Pittman was not permitted to leave. Instead, Defendant Baker, under the pretext of seeing a gun in the Crown Royal bag, conducted an illegal search of the vehicle, aided by Defendants King and Bell. Mr. Pittman was ultimately detained for more than an hour. The Court cannot say that Mr. Pittman's claim that this would not happen to a non-African American driver is implausible. The right not to be subjected to racially selective law enforcement is clearly established. *Marshall*, 345 F.3d at 1167.

The Complaint also sets forth demographic data Mr. Pittman argues supports his equal protection claim that shows that the APD targets African Americans and subjects them to disproportionate use of force, both in terms of incidence and severity. Statistical evidence can be used to show selective law enforcement practices. *See id*, 345 F.3d at 1168. While "'such evidence alone is rarely enough to show discriminatory purpose' . . . [because] to prove an Equal Protection Clause claim, plaintiffs 'must prove that the decisionmakers in his case acted with discriminatory purpose,'" *Handy v. Fisher*, No. 18-cv-00789-RBJ-SKC, 2019 WL 1375677, at *4 (D. Colo. Mar. 27, 2019) (quoting *Blackwell*, 496 F. App'x at 840), the Court finds that that Mr. Pittman's Complaint alleges enough discriminatory intent on the part of the Individual Aurora Defendants for his Fourteenth Amendment claim to survive an effort to dismiss under Rule 12(b)(6).

**b. The Individual Denver Defendants**

The Individual Denver Defendants argue that they are entitled to qualified immunity on all six of Mr. Pittman's claims for relief. The Court will address each in turn, but, as an initial matter, Mr. Pittman's response (Dkt. #34) cites exhibits in the form of Defendants Baker and Salazar's body worn cameras ("BWC"), a police radio recording, and various law enforcement records. (*See* Dkt. ##34-1 & 35.) He claims this evidence rebuts the Individual Denver Defendants' assertion that they were assisting the APD officers who initiated the stop. The Court will not consider Mr. Pittman's new allegations or the attached exhibits. Mr. Pittman cannot amend his complaint by adding factual allegations in response to a motion to dismiss. *See Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir. 1984) (holding that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss") (citations omitted). The Court is therefore limited to assessing the legal sufficiency of the allegations contained within the four corners of the Complaint.

The Court will next turn to the six claims for relief.

### i. Unlawful Detention Under the Fourth Amendment

The Individual Denver Defendants argue that Mr. Pittman's Fourth Amendment unlawful detention claim should be dismissed because they had probable cause to arrest Mr. Pittman. The Court cannot agree.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . shall not be violated." U.S. Const. amend. IV. A warrantless arrest is permissible when an officer "has probable cause to believe that a person committed a crime." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995). An arrest is distinguished by the involuntary,

"highly intrusive" nature of the encounter. *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). "[T]he use of firearms, handcuffs, and other forceful techniques" generally exceed the scope of an investigative detention and enter the realm of an arrest. *United States v. Melendez–Garcia*, 28 F.3d 1046, 1052 (10th Cir.1994). "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) (internal quotation marks omitted). Probable cause is an objective standard; the question is "whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause." *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007). "Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime." *Id.*

   "Police officers are entitled to rely upon information relayed to them by other officers in determining whether there is reasonable suspicion to justify an investigative detention or probable cause to arrest." *Oliver*, 209 F.3d at 1190. "An officer who is called to the scene to conduct a search incident to arrest is not required to reevaluate the arresting officer's probable cause determination in order to protect herself from personal liability." *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998); *see also Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ("[P]olice officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers

requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause."). Thus, "a police officer who acts 'in reliance on what proves to be the flawed conclusions of a fellow police officer' may nonetheless be entitled to qualified immunity as long as the officer's reliance was 'objectively reasonable.'" *Baptiste*, 147 F.3d at 1260 (quoting *Rogers v. Powell*, 120 F.3d 446, 455 (3d Cir. 1997)). That reliance must be in good faith, however; it "does not protect deliberate, reckless, or grossly negligent reliance on the flawed conclusions of a fellow officer." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 882 (10th Cir. 2014)

Here, the Individual Denver Defendants argue that they relied on the APD officers' initial determination to pull Mr. Pittman over because they were alerted to the presence of a cell phone of a fugitive wanted for robbery in Mr. Pittman's vehicle. However, this is not precisely what Mr. Pittman alleges. Instead, he claims that it was only after the stop finished, in response to his demand for an explanation as to why he was pulled over, that an unidentified Task Force member explained that it was because of the alleged wanted fugitive. Prior to that, during the actual stop, none of the individual Defendants asked Mr. Pittman about the alleged fugitive or the cell phone. Instead, Mr. Pittman alleges that Defendants Perez and Baker discussed the charge of Possession of a Weapon by a Previous Offender before any of the searches took place. Once officers confirmed that there was no one else in the car, Defendant Perez then asked Mr. Pittman if there was a gun in the vehicle, which Mr. Pittman denied, and, after confirming that his ID checked out, Defendant Perez told Defendant Baker that "he wasn't their target." This supports an inference that the purported fugitive was not the real reason for the stop, but only a post hoc justification. It also implies that it was the

DPD, or the Task Force as a unit, as opposed to solely the APD, that was the motivating force behind the stop.

Similarly, the Individual Denver Defendants cannot rely on the APD officers' determination the Mr. Pittman was driving under restraint because his driver's license was suspended. The Complaint does not allege that any APD officer informed those present at the scene, including Mr. Pittman and the DPD officers, that Mr. Pittman's license was suspended. Mr. Pittman only alleges that "[i]n an attempt to cover up the misconduct, Defendant King told Defendant Salazar to give Plaintiff false charges for making an illegal turn and driving under suspicion." Under these circumstances, and at this stage in the case, the "good faith defense" does not defeat Mr. Pittman's unlawful detention/seizure claims.

### ii. Unlawful Search of Mr. Pittman Under the Fourth Amendment

Mr. Pittman alleges that Defendant Bell unlawfully searched his person for several minutes, and that Defendants Perez, Nixon, and Mahr "actively participated in the unlawful search by drawing their weapons and helping [the other Defendants] remove Plaintiff from the vehicle to search his person." (Dkt. #1 at 16, ¶¶ 108–09.)

The Individual Denver Defendants argue that the Complaint fails to allege the personal participation of any officer but Defendant Bell, and that Defendant Bell permissibly searched Mr. Pittman incident to a lawful arrest. As to the former argument, as discussed above, Mr. Pittman has alleged that his arrest was not lawful, and "[w]hile police officers may conduct a warrantless search of an individual's personal property if the search is incident to a lawful custodial arrest, officers lacking probable cause to arrest a suspect necessarily lack probable cause to conduct a search incident to that

arrest." *United States v. Valentine*, 539 F.3d 88, 96 (2d Cir. 2008) (citing *New York v. Belton*, 453 U.S. 454, 460 (1981)).

Mr. Pittman also claims that Defendants Perez, Nixon, and Mahr can be liable because they failed to intervene and stop Defendants Bell, King, and Salazar from searching him. Generally, to hold a government official individually liable under § 1983, the plaintiff must establish that the defendant had personal involvement in the alleged constitutional violation. *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011). In other words, there must be an affirmative link between the constitutional deprivation and the defendant's personal participation. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citing *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)). Without an allegation of personal participation, a plaintiff does not state a claim for relief. However, as the Court explained in Mr. Pittman's other cases, the failure to intervene in another officer's unconstitutional conduct may be sufficient to show personal participation. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) ("An officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983."). The Tenth Circuit has held that is "clearly established"

> that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official. In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

*Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

Here, Mr. Pittman alleges that Defendants Perez, Nixon, and Mahr were present at the scene, and it is plausible that they saw and heard what the officers were saying to each other and to Mr. Pittman. When Defendants King and Bell searched Mr. Pittman a third time, it was after Mr. Pittman's identification was checked and cleared; after his car was searched, over Mr. Pittman's objections; after Defendant Perez confirmed out loud that Mr. Pittman was not their target; and no drugs, weapons, or other evidence that a crime had been committed were found. Mr. Pittman plausibly alleges that Defendants Perez, Nixon, and Mahr had sufficient time to intervene and stop at least this last search. Accordingly, they are not entitled to qualified immunity on this Fourth Amendment claim. *See Vondrak*, 535 F.3d at 1210 ("[G]iven Krause's close proximity to the initial handcuffing, and his presence immediately thereafter, the district court was correct in denying qualified immunity to Krause on the excessive force claim.").

### iii. Unlawful Search of Vehicle Under the Fourth Amendment

A search of a vehicle without probable cause violates the Fourth Amendment. *United States v. Ludwig*, 641 F.3d 1243, 1250 (10th Cir. 2011). Probable cause to search a vehicle is "established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Chavez*, 534 F.3d 1338, 1344 (10th Cir. 2008); *see also Fla. v. Harris*, 568 U.S. 237, 243 (2013) ("A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." (citations and internal quotation marks omitted)). Probable cause

does not "require the suspect's guilt to be 'more likely true than false.' Instead, the relevant question is whether a 'substantial probability' existed that the suspect committed the crime, requiring something 'more than a bare suspicion.'" *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (citations omitted). "[O]fficers must consider the totality of the evidence known to them when considering probable cause, and in cases where they have both inculpatory and exculpatory evidence they must not ignore the exculpatory evidence in order to find probable cause." *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 637 (6th Cir. 2004).

Officers can also conduct a protective search of a vehicle's passenger compartment for weapons during an investigative detention when officers have a reasonable belief that a suspect poses a danger. *United States v. Dennison*, 410 F.3d 1203, 1210 (10th Cir. 2005). "Traffic stops are potentially violent encounters and, therefore, if appropriate facts exist to justify an officer's concern, a search may be justified by safety considerations." *United States v. Chambers*, 383 F. App'x 719, 721 (10th Cir. 2010).

The Complaint describes two searches of Mr. Pittman's vehicle. First, after Defendant Baker stated he saw a gun inside a bag on the driver-side floor, Defendant King reached in and moved the bag, confirming that it did not contain a weapon. This search was arguably justifiable on officer safety grounds. (It is notable, however, that Defendants do not appear to have been concerned whether the vehicle contained evidence in the form of the fugitive's cell phone.) But a second search was performed by Defendant Bell and Perez—even after they knew, in Defendant Perez's words, that Mr. Pittman was not their target—under what Mr. Pittman describes as "the guise of an

inventory search." Dkt. #1 at 11, ¶ 64. An inventory search "must not be a ruse for a general rummaging in order to discover incriminating evidence," *Fla. v. Wells*, 495 U.S. 1, 4 (1990), which is what Mr. Pittman alleges here. (*See* Dkt. #1 at 12, ¶ 73 ("Defendants weren't taking inventory of the contents of the vehicle, although there was a lot of valuable property in the vehicle, including money, because their only concern was to search the vehicle for drugs and guns.").) Defendants Bell and Perez's allegedly indiscriminate search of Mr. Pittman's vehicle belie their contention that they were performing an inventory search, relying on APD's decision to tow the car. And Mr. Pittman plausibly alleges that Defendants Nixon and Mahr failed to intervene to stop this second, allegedly unconstitutional search. This claim should not be dismissed on a Rule 12(b)(6) motion.

### iv. Excessive Force Under the Fourth Amendment

In assessing an excessive force claim under the Fourth Amendment, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted). The inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. It must also "allow[ ] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Mr. Pittman alleges that when he was pulled over, all the Defendants converged on Plaintiff's vehicle with their weapons drawn and pointed directly at him. In *Holland ex rel. Overdorff v. Harrington*, the Tenth Circuit established that "the display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force" and may violate the Fourth Amendment if done unreasonably or excessively. 268 F.3d 1179, 1192 (10th Cir. 2001). The *Holland* court found that continuing to point a loaded firearm at a person who has submitted to the authority of the officer and who otherwise poses no reasonable danger violates the Fourth Amendment. *Id.* at 1193. By contrast, an officer in that scenario "may simply hold[ ] the weapon in a fashion ready for immediate use." *Id.*

In *Henry v. Storey*, 658 F.3d 1235 (10th Cir. 2011), the plaintiff, who had complied with all orders from the police and had not committed any traffic offense, was confronted with "six guns aimed at him" when he exited his vehicle during a traffic stop. 658 F.3d at 1238. The Tenth Circuit stated that, even assuming the defendant had his gun pointed at the plaintiff, this "use of force was not excessive under the facts known to him at the time." *Id.* at 1239.

> Viewing the facts from a reasonable officer's point of view, Officer Storey did not use excessive force by pointing his weapon at Mr. Henry. Officer Storey had probable cause to believe Mr. Henry had stolen a vehicle, a felony. Officer Storey could reasonably conclude that the driver posed an immediate threat to the safety of the officers and the public—a driver caught with a stolen vehicle has strong incentive to evade arrest, given the seriousness of the crime. Further, the means of evading arrest were close at hand: the driver was in the vehicle with the engine running. The incident took place late at night, within Albuquerque city limits. Any resulting chase could place the officers and the public at risk. Although Mr. Henry was not actively resisting or evading arrest by flight, under the circumstances the amount of force used by Officer Storey was reasonable. To conclude otherwise would merely second-guess an officer's on-the-ground decision using the benefit of 20/20 hindsight.

*Id.* (citation omitted).

The facts in *Henry* are distinguishable from those contained in Mr. Pittman's Complaint. The most significant difference is the severity of the alleged crime involved. Mr. Pittman alleges he was pulled over for making an illegal turn (which he denies doing) and cited for driving under suspension, which is a much less severe crime than driving a stolen vehicle. Mr. Pittman has plausibly alleged that the fugitive story was concocted as a "ruse" to cover-up Defendants' illegal search and seizure.

A second important difference is that *Henry* was decided on a motion for judgment as a matter of law after a trial was held. On a Rule 12(b)(6) motion, on the other hand, the Court only looks at Mr. Pittman's well-pled allegations.

Magistrate Judge Michael E. Hegarty examined the applicable Tenth Circuit authority in this type of excessive force case in *Boyd v. Montezuma Cty. Sheriff's Off.*, No. 15-cv-00101-MEH, 2015 WL 2329119 (D. Colo. May 12, 2015), and concluded as follows:

> What is clear to me after reading these cases is that the Tenth Circuit decided, prior to the facts in this case, that (1) a law enforcement officer's pointing of a gun at someone might, without more, constitute excessive force; (2) the determination of excessive force depends on the factual circumstances of the gun-pointing conduct; and (3) those circumstances include, at the very least, the seriousness of the alleged criminal offense at issue in the stop, whether the plaintiff is a suspect or bystander, whether there was a threat to pull the trigger, how long the officer had his or her gun "trained" on the plaintiff, and whether the gun was pointed longer than necessary *(e.g.*, continuing the pointing after the situation was under control).

2015 WL 2329119, at *5. The Court agrees with Judge Hegarty that "[t]his is a fact-intensive inquiry, inappropriate for determination at the motion to dismiss stage." *Id.* For example, it is unclear how long Defendants' guns were trained on Mr. Pittman, and whether Defendants continued pointing after Mr. Pittman was "under control." These

facts can be resolved on summary judgment or at trial, but at this stage Mr. Pittman has sufficiently stated an excessive force claim against all Defendants.

### v. Excessive Force Under the Fourteenth Amendment

Excessive force claims are governed by the Fourth Amendment, rather than the Fourteenth Amendment, when, as here, force is used between a warrantless arrest and a probable cause hearing. *J.H. ex rel. J.P. v. Bernalillo Cty.*, 806 F.3d 1255, 1259 (10th Cir. 2015) (citing *Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014)). The Court recommends, and Mr. Pittman agrees (*see* Dkt. #34 at 12), that his Fourteenth Amendment excessive force claims should be dismissed.

### vi. Equal Protection Violation Under the Fourteenth Amendment

Mr. Pittman alleges that the Individual Denver Defendants violated his Fourteenth Amendment equal protection rights by targeting him based on his race when they detained him beyond the scope of the traffic stop, used force, and decided how much force to use. The Court agrees with the Individual Denver Defendants that Mr. Pittman has not alleged a discriminatory purpose or effect.

The initial stop cannot form the basis of an equal protection claim against the Individual Denver Defendants. According to the Complaint, the only Denver officer who was aware of Mr. Pittman's race before the stop was Defendant Mahr, but the Complaint is clear that Defendant King made the decision to pull Mr. Pittman over. Defendants Bell, Perez, and Nixon are not alleged to have known Mr. Pittman was African American until Mr. Pittman got out of the vehicle.

Moreover, while Mr. Pittman cited statistical evidence that he alleges shows that APD subjected people of color to greater use of force than white citizens, he offers no

similar evidence as to the DPD, nor has he identified any similarly situated individuals whom the DPD treated with comparable force. In other words, he has not pled a discriminatory effect. This claim should be dismissed.

## III. Municipal Liability Claims

The Supreme Court held in M*onell v. Department of Social Services* that "person," as used in § 1983, includes "municipalities and other local government units" 436 U.S. 658, 691 (1978). To state a claim for municipal liability under § 1983 for the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). A municipal policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted). But, whatever species of policy or custom is alleged,

> [t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

### a. The City of Denver

It is clear from a close review of Mr. Pittman's Complaint that real target of his municipal liability claims is Aurora, not Denver, a conclusion bolstered by Mr. Pittman's failure to respond to Denver's motion. Only the first claim contains an allegation of a municipal custom or policy (a theory of failure to train, discipline, and supervise and/or a theory of ratification), and it does so in a conclusory fashion:

> 102. The APD and DPD nevertheless determined that the action of the Defendants Officers involving Plaintiff on April 24, 2021 were lawful and that no disciplinary action, training, or additional supervision were necessary.

> 103. Upon information and belief, no officer that been disciplined, reprimanded, or received additional training as a result of the April 23, 2020 incident with Plaintiff.

(Dkt. #1 at 15–16, ¶¶ 102–103.)

The standards for pleading a municipal liability claim are stringent, particularly the claim is based on a failure to train theory. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."); *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). Mr. Pittman does not allege any facts regarding Denver's supervision and training policies or why they are inadequate.

As for ratification, a municipality will not be found liable under this theory "unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as

the basis for these actions." *Bryson*, 627 F.3d at 790. The Complaint does not identify any final decisionmaker and is therefore legally deficient.

### b. The City of Aurora

In contrast to Mr. Pittman's bare and conclusory claims against Denver, his Complaint is brimming with specific allegations that Aurora has a persistent and widespread informal custom of unlawfully seizing and searching African Americans and subjecting them to excessive force based on their race. The Court addressed this issue in Mr. Pittman's two prior cases and allowed his municipal claims to go forward over similar objections that Aurora makes here.

> To establish municipal liability on the basis of custom or practice, a plaintiff must show: (1) the existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the municipality's employees; (2) deliberate indifference to or tacit approval of such misconduct by the municipality's policymaking officials after notice to the officials of that particular misconduct; and (3) that the plaintiff was injured by virtue of the unconstitutional acts pursuant to the custom and that the custom was the moving force behind the unconstitutional acts. *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993). "In attempting to prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008).

> A municipality's failure to adequately train, supervise, or discipline employees can also be used to establish municipal liability if "that failure results from deliberate indifference to the injuries that may be caused." *Bryson*, 627 F.3d at 788 (internal quotation marks omitted). *See also City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). This standard is met if a "municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002) (internal quotation marks omitted).

> The Court finds that Mr. Pittman has adequately alleged municipal liability under both theories. In other words, he has stated a claim that the City has an informal policy or custom of unlawfully searching and seizing

African Americans based on their race and arrest record, and that the City deliberately ignored the risk that its failure to train, supervise, or discipline its officers would result in constitutional violations. In his Second Amended Complaint, Mr. Pittman provides numerous examples where officers of the Aurora Police Department extended traffic stops of African Americans beyond their permissible scope to conduct unlawful searches based solely on the driver's race and arrest record. *See* Dkt. #83 at 11–27, ¶¶ 75–196. Despite the fact that in each instance, the victims made a citizen complaint with the department and then filed a federal lawsuit, Mr. Pittman alleges that the City never re-trained, disciplined, or provided additional supervision to any of the officers involved. In fact, Mr. Pittman notes that Lieutenant Cerinich criticized the City Attorney's Office for dismissing the case against him. And then, in April 2019, Mr. Pittman himself was pulled over again under similar circumstances and with similar results.

One example Mr. Pittman provides, which the Court finds illustrative, involves an African American couple who were stopped by officers on East Colfax Avenue for a defective taillight. *See id.* at 14–17, ¶¶ 89–111. One of the officers was recorded saying that the male passenger's "got priors for coke, drug abuser, and gang stuff. . . . So let's pull em' out [of the car], we'll pat em' down, [and] just sit em' [on the curb]. I'll ask her for consent, if she denies it either way we'll protective sweep the car, make sure there's no weapons in there and then I'll finish the summons." *Id.* at 14, ¶ 93. The couple and the car were searched and nothing illegal was found. Not only are there marked similarities between this situation and the ones described by Mr. Pittman here and in his other case, during a February 10, 2020 Rule 30(b)(6) deposition, the Deputy Chief of the Aurora Police Department testified the officer's actions were lawful and agreed that no discipline, training, or additional supervision was necessary as a result of that incident. *Id.* at 36, ¶ 258.

The City argues states that while Mr. Pittman "alleges that there are ten unspecified instances of improper searches identified in the discovery of one of those cases," the Second Amended Complaint "gives no factual allegations to support this conclusion, nor does it identify any alleged conduct of officers or details that would explain the circumstances of these allegations." The Court dismisses this argument out of hand. The Second Amended Complete is replete with specific factual allegations regarding the other incidents. The Court likewise rejects the City's claim that the cases cited by Mr. Pittman are insufficient to support an inference of widespread custom because none have resulted in adjudication with liability. As then-Chief Judge Marcia S. Krieger stated in *Estate of Valverde by & through Padilla v. Dodge*, No. 16-cv-1703-MSK-MEH, 2017 WL 3530282, at *4 (D. Colo. Aug. 17, 2017), "[t]he outcome of any of the lawsuits is not relevant to the issue at hand. Taking the allegations as true, they could plausibly demonstrate the existence of an informal custom or practice that resulted in

[racial profiling], and therefore the allegations are sufficient to state a *Monell* claim."

Additionally, Magistrate Judge Kristen L. Mix recently found that a plaintiff's list of eight prior incidents involving alleged misconduct by Aurora Police Department officers that went unpunished demonstrated that the City has "constructive notice that its failure to discipline these officers is likely to result in significant harm to the public." *Diallo v. Milligan*, No. 18-cv-02898-REB-KLM, 2019 WL 3302166, at *12 (D. Colo. July 23, 2019). This Court finds likewise. The examples provided by Mr. Pittman sufficiently establish a clear and persistent pattern of deliberate indifference for Rule 12(b)(6) purposes. *See id.* at *13. And, as Judge Mix acknowledged, "[t]he Tenth Circuit has stated that 'failure to investigate or reprimand might [ ] cause a future violation by sending a message to officers that such behavior is tolerated.'" *Id.* (quoting *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009). The fact that the City repeatedly failed to retrain or discipline its officers for unlawful searches and seizures involving African American drivers, even in the face of the City's own attorneys' condemnation of the practice, plausibly supports the conclusion that the Defendant Officers believed their unconstitutional behavior would be tolerated. Thus, the failure to train can be considered a "moving force" behind Mr. Pittman's injuries. *See id.*

*Pittman v. City of Aurora*, No. 19-cv-01947-PAB-NRN, 2020 WL 6586659, at *10–11 (D. Colo. Oct. 23, 2020), *report and recommendation adopted*, No. 19-CV-01947-PAB-NRN, 2020 WL 6585841 (D. Colo. Nov. 10, 2020); *see also Pittman v. City of Aurora*, No. 19-cv-02209-PAB-NRN, 2020 WL 6586638, at *7–9 (D. Colo. Oct. 23, 2020), *report and recommendation adopted*, No. 19-CV-02209-PAB-NRN, 2020 WL 6585840 (D. Colo. Nov. 10, 2020) (finding the same).

At this stage, Aurora's apparent pattern of aggressively (and allegedly unlawfully) targeting Mr. Pittman over the past few years may in itself be sufficient to support his municipal liability claim. Taken together with the numerous other examples contained in his Complaint, the Court finds that Mr. Pittman states a § 1983 claim against Aurora.

## RECOMMENDATION

It is hereby **RECOMMENDED** as follows:

- That the Individual Denver Defendants' Motion to Dismiss Plaintiff's Complaint (Dkt. #17) be **GRANTED IN PART** and **DENIED IN PART** such that only Mr. Pittman's Fourteenth Amendment claims (Claims Five Claim Six) be dismissed against the Individual Denver Defendants;

- That Denver and the Individual Denver Defendants in their official capacities' Motion to Dismiss (Dkt. #18) be **GRANTED**;

- Defendant Aurora and the Individual Aurora Defendants in their official capacities' Motion to Dismiss (Dkt. #38) be **GRANTED IN PART** and **DENIED IN PART** such that Mr. Pittman's municipal liability claims proceed only against the City of Aurora; and

- The Individual Aurora Defendants in their individual capacities' Motion for Partial Dismissal (Dkt. #39) be **DENIED**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.**

*Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).


Dated:     June 17, 2021
           Denver, Colorado         _____
                                    N. Reid. Neureiter
                                    United States Magistrate Judge